*Execution Version*

EXCHANGE AGREEMENT

by and among

CAHABA GATHERING, LLC

CDX BISHOP CREEK, LLC

CDX SEQUOYA, LLC

CDX GAS, LLC

and

CD EXPLORATION, LLC,

as CDX Parties,

and

CALERA GAS, LLC

CALERA GATHERING, LLC

and

WALLACE ASSOCIATES II,

as Wallace Parties

Dated as of May 29, 2009

## TABLE OF CONTENTS

ARTICLE I  DEFINITIONS..................................................................................................... 1

Section 1.1    Definitions.............................................................................................. 1
Section 1.2    Other Definitional Provisions................................................................ 7

ARTICLE II  EXCHANGE TRANSACTION .......................................................................... 8

Section 2.1    Transfer of CDX Transferred Assets...................................................... 8

ARTICLE III  CLOSING AND TERMINATION ..................................................................... 9

Section 3.1    Time and Place of Closing..................................................................... 9
Section 3.2    Termination of Agreement..................................................................... 9
Section 3.3    Effect of Termination............................................................................. 9

ARTICLE IV  REPRESENTATIONS AND WARRANTIES OF CDX PARTIES................. 10

Section 4.1    Organization and Good Standing ........................................................ 10
Section 4.2    Authorization of Agreement................................................................ 10
Section 4.3    No Violation; Consents........................................................................ 10

ARTICLE V  REPRESENTATIONS AND WARRANTIES OF WALLACE PARTIES ...... 11

Section 5.1    Organization and Good Standing ........................................................ 11
Section 5.2    Authorization of Agreement................................................................ 11
Section 5.3    No Violation; Consents........................................................................ 11

ARTICLE VI  COVENANTS................................................................................................... 12

Section 6.1    Access to Information........................................................................... 12
Section 6.2    Contact with Vendors Pending Closing .............................................. 13
Section 6.3    Conduct of Business Pending the Closing. ......................................... 13
Section 6.4    Appropriate Action .............................................................................. 13
Section 6.5    Bankruptcy Matters ............................................................................. 14
Section 6.6    Public Announcements ........................................................................ 14
Section 6.7    Further Assurances; Intent of the Parties ............................................ 14
Section 6.8    Third Party Consents. .......................................................................... 14
Section 6.9    Governmental Bonds. .......................................................................... 15
Section 6.10   Transfer Taxes..................................................................................... 15

ARTICLE VII  CONDITIONS TO CLOSING......................................................................... 16

Section 7.1    Conditions Precedent to Obligations of All Parties ............................ 16
Section 7.2    Conditions Precedent to Obligations of CDX Parties ......................... 16
Section 7.3    Conditions Precedent to Obligations of Wallace Parties .................... 17

ARTICLE VIII  DOCUMENTS TO BE DELIVERED ........................................................... 17

Section 8.1    Documents to Be Delivered by CDX Parties ....................................... 17
Section 8.2    Documents to Be Delivered by Wallace Parties .................................. 18
Section 8.3    Assignment of Wallace Transferred Assets to Be Executed by W. Ray Wallace ........... 18

ARTICLE IX  LIMITATIONS ................................................................................................. 18

Section 9.1    LIMITATION OF REPRESENTATIONS AND WARRANTIES.............. 18
Section 9.2    NO CONSEQUENTIAL OR PUNITIVE DAMAGES............................ 20
Section 9.3    CONSPICUOUS .................................................................................. 20

i

ARTICLE X  MISCELLANEOUS ............................................................................................ 20
Section 10.1      Nonsurvival of Representations and Warranties ...................................... 20
Section 10.2      Intentionally Omitted. ............................................................................. 20
Section 10.3      Costs and Expenses ................................................................................ 20
Section 10.4      Submission to Jurisdiction. .................................................................... 20
Section 10.5      Waiver of Jury Trial................................................................................ 21
Section 10.6      Time of Essence ..................................................................................... 21
Section 10.7      Entire Agreement; Amendments; Waivers .............................................. 21
Section 10.8      GOVERNING LAW ............................................................................... 21
Section 10.9      Notices ................................................................................................... 22
Section 10.10     Severability ............................................................................................ 22
Section 10.11     Binding Effect; Assignment.................................................................... 23
Section 10.12     Counterparts........................................................................................... 23
Section 10.13     Authorization by CDX Parties ............................................................... 23

<u>Exhibits</u>

| | | |
|---|---|---|
| Exhibit A – Part 1 | – | CDX Leases |
| Exhibit A – Part 2 | – | CDX Wells |
| Exhibit A – Part 3 | – | CDX Gathering Assets |
| Exhibit A – Part 4 | – | CDX Easements |
| Exhibit B | – | Wallace Wells |
| Exhibit C | – | Form of Assignment |

<u>Schedules</u>

| | | |
|---|---|---|
| Schedule 1.1(a) | – | Assumed CDX Contracts |
| Schedule 4.3(a) | – | Violations of CDX Parties |
| Schedule 4.3(b) | – | Consents of CDX Parties |
| Schedule 5.3(a) | – | Violations of Wallace Parties |
| Schedule 5.3(b) | – | Consents of Wallace Parties |

## EXCHANGE AGREEMENT

THIS EXCHANGE AGREEMENT (this "Agreement"), dated as of May 29, 2009, is made and entered into by and among Cahaba Gathering, LLC, a Delaware limited liability company ("CDX Gathering"), CDX Bishop Creek, LLC, a Delaware limited liability company ("CDX Bishop Creek"), CDX Sequoya, LLC, a Delaware limited liability company ("CDX Sequoya"), CDX Gas, LLC, a Delaware limited liability company ("CDX Gas") and CD Exploration, LLC, a Delaware limited liability company ("CD Exploration" and, together with CDX Gathering, CDX Bishop Creek, CDX Sequoya and CDX Gas, "CDX Parties"), on the one hand, and Calera Gas, LLC, a Nevada limited liability company ("Calera Gas"), Calera Gathering, LLC, a Nevada limited liability company ("Calera Gathering"), and Wallace Associates II, a Texas general partnership ("Wallace Associates" and, together with Calera Gas and Calera Gathering, "Wallace Parties"), on the other hand. CDX Parties and Wallace Parties are sometimes referred to herein as "Parties".

### RECITALS

WHEREAS, CDX Parties own the CDX Transferred Assets (as defined below);

WHEREAS, Wallace Associates owns the Wallace Transferred Assets (as defined below); and

WHEREAS, on the terms and subject to the conditions hereinafter set forth, the Parties desire to enter into this Agreement, pursuant to which, among other things, CDX Parties shall transfer to Calera Gas the CDX Transferred Assets, and Wallace Associates shall transfer to CDX Gas the Wallace Transferred Assets.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1    Definitions.  As used in this Agreement, the following terms have the respective meanings set forth below or set forth in the Sections referred to below:

"Action" means any action, litigation, suit, arbitration or proceeding by or before any Governmental Authority of any nature, civil, criminal, regulatory or otherwise, in law or in equity.

"Affiliate" (and, with a correlative meaning "affiliated") means, with respect to any Person, any direct or indirect subsidiary of such Person, and any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first Person. As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of power to direct or cause the direction of management and policies (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise).

"Agreement" shall have the meaning set forth in the preamble to this Agreement.

1

"Applicable Law" means, with respect to any Person, any federal, state or local law (including common law), statute, code, ordinance, rule, regulation or other requirement enacted, promulgated, issued or entered by a Governmental Authority, in any case, applicable to such Person or its business, properties or assets.

"Assignment" means the Assignment, Bill of Sale and Assumption Agreement substantially in the form of Exhibit C, which shall contain a special or limited, as applicable, warranty of title.

"Assumed CDX Contracts" means, to the extent assignable pursuant to section 365 of the Bankruptcy Code, all Contracts set forth on Schedule 1.1(a).

"Bankruptcy Cases" means the chapter 11 cases commenced by CDX Gas and certain of its Affiliates, including CDX Parties, on December 12, 2008 and April 1, 2009 (including any case commenced after the date hereof), jointly administered under Case No. 08-37922.

"Bankruptcy Code" means title 11 of the United States Code, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division or any other court having jurisdiction over the Bankruptcy Cases from time to time.

"Bankruptcy Order" means an Order of the Bankruptcy Court, in a form and substance reasonably acceptable to CDX Parties, pursuant to sections 363 and 365 of the Bankruptcy Code that, to the extent permitted by Applicable Law and subject to Section 2.1(d), among other things:

(a)     authorizes the transfer of the CDX Transferred Assets, free and clear of all Liens; and

(b)     authorizes the assumption and assignment of the Assumed CDX Contracts.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in Texas are authorized or required by Applicable Law to close.  Any event the scheduled occurrence of which would fall on a day that is not a Business Day shall be deferred until the next succeeding Business Day.

"Calera Gas" shall have the meaning set forth in the preamble to this Agreement.

"Calera Gathering" shall have the meaning set forth in the preamble to this Agreement.

"CD Exploration" shall have the meaning set forth in the preamble to this Agreement.

"CDX Assumed Liabilities" means any and all Liabilities arising on or after the Closing Date relating to or in connection with the CDX Transferred Assets.

"CDX Bishop Creek" shall have the meaning set forth in the preamble to this Agreement.

"CDX Excluded Assets" means all of CDX Parties' right, title and interest in and to all assets and properties owned, leased or used by CDX Parties, other than the CDX Transferred Assets.

"CDX Gas" shall have the meaning set forth in the preamble to this Agreement.

2

"CDX Gathering" shall have the meaning set forth in the preamble to this Agreement.

"CDX Gathering Assets" shall have the meaning set forth in the definition of "CDX Transferred Assets".

"CDX Imbalance" means any imbalance at the wellhead between the amount of Hydrocarbons produced from a CDX Well and taken by and allocated to the CDX Parties and the amount of Hydrocarbons produced from a CDX Well and allocable to CDX Parties' interest therein.

"CDX Lands" shall have the meaning set forth in the definition of "CDX Transferred Assets".

"CDX Leases" shall have the meaning set forth in the definition of "CDX Transferred Assets".

"CDX Material Adverse Effect" means any fact, change, circumstance or event (whether or not such fact, change, circumstance or event is long-term or short-term or is foreseeable or known as of the date hereof) that (a) could reasonably be expected to result in a material adverse effect on CDX Parties or the use, ownership or operation of the CDX Transferred Assets, taken as a whole and as operated as of the date hereof, or (b) materially hinders, delays or impedes the ability of the CDX Parties to consummate the transactions contemplated hereby; provided, however, that no fact, change, circumstance or event that arises or results from the following shall constitute a CDX Material Adverse Effect: (i) changes in general economic, capital market, regulatory or political conditions or changes in Applicable Law or the interpretation thereof that, in any case, do not disproportionately affect CDX Parties or the use, ownership or operation of the CDX Transferred Assets; (ii) changes that affect generally the industry in which the CDX Transferred Assets are employed and do not disproportionately affect CDX Parties or the use, ownership or operation of the CDX Transferred Assets; (iii) the declaration by the United States of a national emergency or acts of war or terrorism or act of God that, in any case, do not disproportionately affect CDX Parties or the use, ownership or operation of the CDX Transferred Assets; (iv) the entry into or announcement of the transactions contemplated by this Agreement or the consummation of the transactions contemplated hereby; (v) any changes in GAAP as applied to CDX Parties; (vi) any changes in the prices of Hydrocarbons; or (vii) any natural declines in well performance.

"CDX Parties" shall have the meaning set forth in the preamble to this Agreement.

"CDX Sequoya" shall have the meaning set forth in the preamble to this Agreement.

"CDX Transferred Assets" means all of CDX Parties' right, title and interest in and to the following as of the Closing Date:

(a)     the oil and gas leases, coal bed methane leases and/or fee mineral interests more particularly described in Exhibit A – Part 1 (collectively, the "CDX Leases"), together with any and all other right, title and interest of CDX Parties in and to (i) the leasehold or fee estates created thereby and (ii) the lands covered by the CDX Leases or included in units with which the CDX Leases may have been pooled, unitized or communitized (collectively, the "CDX Lands"), including, in each case, fee mineral interests, royalty interests, overriding royalty interests, production payments, net profits interests, carried interests and reversionary interests;

(b)     all wells located on the CDX Leases or the CDX Lands (collectively, and including the wells set forth in Exhibit A – Part 2, the "CDX Wells");

3

(c)     the gas gathering system, facilities, pipelines, compressors, pig and other stations generally described on Exhibit A – Part 3 (the "CDX Gathering Assets");

(d)     all permits, licenses, servitudes, easements, rights-of-way and surface agreements used or held for use primarily in connection with the ownership or operation of the CDX Leases, the CDX Lands, the CDX Wells or the CDX Gathering Assets, including those set forth Exhibit A – Part 4;

(e)     all rights and interests in, under or derived from all unitization, pooling and communitization agreements in effect with respect to the CDX Leases, the CDX Lands or the CDX Wells;

(f)     all Assumed CDX Contracts;

(g)     all Hydrocarbons produced from or attributable to the CDX Leases, the CDX Lands or the CDX Wells from and after the Closing Date;

(h)     all equipment, machinery, fixtures, improvements and other real, personal and mixed property (in each case whether operational or non-operational, known or unknown) located on, or used or held for use primarily in connection with the ownership or operation of, the CDX Leases, the CDX Lands, the CDX Wells and the CDX Gathering Assets;

(i)     all CDX Imbalances, if any; and

(j)     copies of all of the files, records, information and data, whether written or electronically stored, primarily relating to the CDX Transferred Assets, including (i) land and title records (including abstracts of title, title opinions and title curative documents); (ii) contract files; (iii) correspondence; (iv) operations, environmental, production and accounting records and (v) facility and well records.

"CDX Wells" shall have the meaning set forth in the definition of "CDX Transferred Assets".

"Closing" shall have the meaning set forth in Section 3.1.

"Closing Date" shall have the meaning set forth in Section 3.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, loan, instrument, lease, commitment or other agreement.

"GAAP" means United States generally accepted accounting principles.

"Governmental Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to United States federal, state or local government, including any governmental authority, agency, department, board, commission or instrumentality or any political subdivision thereof, and any tribunal, court or arbitrators of competent jurisdiction, and shall include the Bankruptcy Court.

4

"Hydrocarbons" means oil and gas and other hydrocarbons produced or processed in association therewith.

"Liabilities" means any and all debts, losses, liabilities, claims (including claims as defined in the Bankruptcy Code), damages, expenses, fines, costs, royalties, proceedings, deficiencies or obligations (including those arising out of any Action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, absolute, accrued, contingent or otherwise, and whether or not resulting from third party claims, and any reasonable out-of-pocket costs and expenses (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any Action or in investigating any of the same or in asserting any rights hereunder).

"Lien" means any lien, pledge, mortgage, deed of trust, security interest, claim, charge, option or encumbrance.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Outside Date" shall have the meaning set forth in Section 3.2(b).

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates.

"Person" means and includes any natural person, corporation, limited partnership, limited liability company, general partnership, joint venture, association or other organization, whether or not a legal entity, and all Governmental Authorities.

"Property Taxes" shall have the meaning set forth in Section 6.11(a).

"Representatives" of a Person means its respective officers, directors, managers, employees, attorneys, investment bankers, accountants and other agents and representatives.

"Tax" means any and all taxes on income, profit and gains and any and all franchise, gross receipts, environmental, customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, payroll, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, petroleum revenue, excise and other taxes, withholdings, duties, levies, imposts and other similar charges (including unclaimed property and escheat obligations) and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies, other assessments or late or incorrect filings, and interest thereon) imposed by or on behalf of any Taxing Authority.

"Tax Returns" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

"Taxing Authority" means any Governmental Authority exercising any authority to impose, regulate, levy, assess or administer the imposition of any Tax.

"Transaction Documents" means the Assignment and all other Contracts and documents necessary to effectuate the transactions completed hereby.

5

"Transfer Taxes" shall have the meaning set forth in Section 6.10(a).

"Wallace Associates" shall have the meaning set forth in the preamble to this Agreement.

"Wallace Assumed Liabilities" means any and all Liabilities arising on or after the Closing Date relating to or in connection with the Wallace Transferred Assets.

"Wallace Excluded Assets" means all of Wallace Associates' right, title and interest in and to all assets and properties owned, leased or used by Wallace Associates, other than the Wallace Transferred Assets.

"Wallace Imbalance" means any imbalance at the wellhead between the amount of Hydrocarbons produced from a Wallace Well and taken by and allocated to Wallace Associates and the amount of Hydrocarbons produced from a Wallace Well and allocable to Wallace Associates' interest therein.

"Wallace Lands" shall have the meaning set forth in the definition of "Wallace Transferred Assets".

"Wallace Leases" shall have the meaning set forth in the definition of "Wallace Transferred Assets".

"Wallace Material Adverse Effect" means any fact, change, circumstance or event (whether or not such fact, change, circumstance or event is long-term or short-term or is foreseeable or known as of the date hereof) that (a) could reasonably be expected to result in a material adverse effect on Wallace Parties or the use, ownership or operation of the Wallace Transferred Assets, taken as a whole and as operated as of the date hereof, or (b) materially hinders, delays or impedes the ability of the Wallace Parties to consummate the transactions contemplated hereby; provided, however, that no fact, change, circumstance or event that arises or results from the following shall constitute a Wallace Material Adverse Effect: (i) changes in general economic, capital market, regulatory or political conditions or changes in Applicable Law or the interpretation thereof that, in any case, do not disproportionately affect Wallace Parties or the use, ownership or operation of the Wallace Transferred Assets; (ii) changes that affect generally the industry in which the Wallace Transferred Assets are employed and do not disproportionately affect Wallace Parties or the use, ownership or operation of the Wallace Transferred Assets; (iii) the declaration by the United States of a national emergency or acts of war or terrorism or act of God that, in any case, do not disproportionately affect Wallace Parties or the use, ownership or operation of the Wallace Transferred Assets; (iv) the entry into or announcement of the transactions contemplated by this Agreement or the consummation of the transactions contemplated hereby; (v) any changes in GAAP as applied to Wallace Parties; (vi) any changes in the prices of Hydrocarbons; or (vii) any natural declines in well performance.

"Wallace Parties" shall have the meaning set forth in the preamble to this Agreement.

"Wallace Transferred Assets" means all of Wallace Associates' right, title and interest in and to the following as of the Closing Date:

(a)     the oil and gas leases, coal bed methane leases and/or fee mineral interests, in each case, upon which the Wallace Wells are located or that relate in any respect to the Wallace Wells (collectively, the "Wallace Leases"), together with any and all other right, title and interest of Wallace Associates in and to (i) the leasehold or fee estates created thereby and (ii) the lands covered by the

6

Wallace Leases or included in units with which the Wallace Leases may have been pooled, unitized or communitized (collectively, the "Wallace Lands"), including, in each case, fee mineral interests, royalty interests, overriding royalty interests, production payments, net profits interests, carried interests and reversionary interests;

        (b)     all wells set forth in Exhibit B (the "Wallace Wells");

        (c)     all permits, licenses, servitudes, easements, rights-of-way and surface agreements used or held for use primarily in connection with the ownership or operation of the Wallace Leases, the Wallace Lands or the Wallace Wells;

        (d)     all rights and interests in, under or derived from all unitization, pooling and communitization agreements in effect with respect to the Wallace Leases, the Wallace Lands or the Wallace Wells;

        (e)     all Contracts primarily relating to the Wallace Transferred Assets;

        (f)     all Hydrocarbons produced from or attributable to the Wallace Leases, the Wallace Lands and the Wallace Wells from and after the Closing Date;

        (g)     all equipment, machinery, fixtures, improvements and other real, personal and mixed property (in each case whether operational or non-operational, known or unknown) located on, or used or held for use primarily in connection with the ownership or operation of, the Wallace Leases, the Wallace Lands or the Wallace Wells;

        (h)     all Wallace Imbalances, if any; and

        (i)     copies of all of the files, records, information and data, whether written or electronically stored, primarily relating to the Wallace Transferred Assets, including (i) land and title records (including abstracts of title, title opinions and title curative documents); (ii) contract files; (iii) correspondence; (iv) operations, environmental, production and accounting records and (v) facility and well records.

        "Wallace Wells" shall have the meaning set forth in the definition of "Wallace Transferred Assets".

        Section 1.2     Other Definitional Provisions.

        (a)     The words "hereof", "herein", and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The word "or" is inclusive and not exclusive. The table of contents and section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

        (b)     All Article, Section, Schedule and Exhibit references herein are to Articles, Sections, Schedules and Exhibits of this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Disclosure of any item or matter on any Schedule shall not

constitute an admission or indication that such item or matter is material.  No disclosure on a Schedule relating to a possible breach or violation of any Contract, Applicable Law or Order shall be construed as an admission or indication that breach or violation exists or has actually occurred.  The disclosure of a particular item of information in a Schedule shall not be taken as an admission by the Party making such disclosure that such disclosure is required to be made.  Any capitalized terms used in any Schedule or Exhibit, but not otherwise defined therein, shall be defined as set forth in this Agreement.

(c)     This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

ARTICLE II<br>EXCHANGE TRANSACTION

Section 2.1     Transfer of CDX Transferred Assets.

(a)     CDX Transferred Assets.  On the terms and subject to the conditions set forth herein and in consideration of the transfer of the Wallace Transferred Assets from Wallace Associates to CDX Gas set forth in Section 2.2(a) and the assumption of the CDX Assumed Liabilities by Calera Gas set forth in Section 2.1(b), at the Closing, subject to Section 2.1(d), CDX Parties shall exchange, transfer, assign and deliver to Calera Gas the CDX Transferred Assets, and Calera Gas shall assume and accept the CDX Transferred Assets from CDX Parties.  CDX Parties shall reserve and retain all of the CDX Excluded Assets.

(b)     CDX Assumed Liabilities.  On the terms and subject to the conditions set forth herein, at the Closing, subject to Section 2.1(d), Calera Gas shall assume and accept the CDX Assumed Liabilities.  For the avoidance of doubt, Calera Gas does not assume and CDX Parties retain all Liabilities arising before the Closing Date relating to or in connection with the CDX Transferred Assets or production therefrom (including Liabilities in the nature of production or severance taxes).

(c)     Cure Amounts.  At the Closing, CDX Parties shall assume the Assumed CDX Contracts pursuant to section 365 of the Bankruptcy Code and, subject to Section 2.1(d), shall then assign to Calera Gas, and Calera Gas shall assume from CDX Parties, such Assumed CDX Contracts.  The cure amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all losses that have resulted from such defaults under the Assumed CDX Contracts, if any, shall be paid by CDX Parties on or before the Closing.

(d)     Assignment to Calera Gathering.  Notwithstanding anything to the contrary in this Article II, prior to the Closing, Calera Gas may assign to Calera Gathering its right to receive the CDX Transferred Assets primarily relating to the CDX Gathering Assets from CDX Parties.

Section 2.2     Transfer of Wallace Transferred Assets.

(a)     Wallace Transferred Assets.  On the terms and subject to the conditions set forth herein and in consideration of the transfer of the CDX Transferred Assets from CDX Parties to Calera Gas set forth in Section 2.1(a) and the assumption of the Wallace Assumed Liabilities by CDX Gas set forth in Section 2.2(b), at the Closing, Wallace Associates shall exchange, transfer, assign and deliver to CDX Gas the Wallace Transferred Assets, and CDX Gas shall assume and accept the Wallace Transferred

8

Assets from Wallace Associates.  Wallace Associates shall reserve and retain all of the Wallace Excluded Assets.

(b)     <u>Wallace Assumed Liabilities</u>.  On the terms and subject to the conditions set forth herein, at the Closing, CDX Gas shall assume and accept the Wallace Assumed Liabilities.  For the avoidance of doubt, CDX Gas does not assume and Wallace Associates retains all Liabilities arising before the Closing Date relating to or in connection with the Wallace Transferred Assets or production therefrom (including Liabilities in the nature of production or severance taxes).

ARTICLE III
CLOSING AND TERMINATION

Section 3.1     <u>Time and Place of Closing</u>.  The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of Vinson & Elkins LLP located at 1001 Fannin, Suite 2500, Houston, TX 77002 at 10:00 a.m. local time, on the first (1st) Business Day after the condition to Closing set forth in <u>Section 7.1(b)</u> has been satisfied, or at such other place, date and time as the Parties may agree (the "<u>Closing Date</u>").

Section 3.2     <u>Termination of Agreement</u>.  This Agreement may be terminated prior to the Closing Date as follows:

(a)     by a written instrument executed by CDX Parties, on the one hand, and Wallace Parties, on the other hand;

(b)     by either CDX Parties or Wallace Parties if the Closing has not occurred by the close of business on June 30, 2009 (as may be extended by written agreement of the Parties, the "<u>Outside Date</u>"); <u>provided, however</u>, that the terminating Parties are not in breach of their obligations hereunder in any material respect;

(c)     by CDX Parties, so long as CDX Parties are not then in breach of their obligations hereunder in any material respect, upon a breach of any covenant or agreement of Wallace Parties set forth in this Agreement, or if any representation or warranty of Wallace Parties shall have been or becomes untrue, in each case such that the conditions set forth in <u>Section 7.3(a)</u> or <u>Section 7.3(b)</u>, as the case may be, would not be satisfied and such breach or untruth cannot be cured by the Outside Date; or

(d)     by Wallace Parties, so long as Wallace Parties are not then in breach of their obligations under this Agreement in any material respect, upon a breach of any covenant or agreement of CDX Parties set forth in this Agreement, or if any representation or warranty of CDX Parties shall have been or becomes untrue, in each case such that the conditions set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u>, as the case may be, would not be satisfied and such breach or untruth cannot be cured by the Outside Date.

Section 3.3     <u>Effect of Termination</u>.  No termination of this Agreement pursuant to <u>Section 3.2</u> shall be effective until notice thereof is given to the non-terminating Parties specifying the provision hereof pursuant to which such termination is made.  If validly terminated pursuant to <u>Section 3.2</u>, this Agreement shall become wholly void and of no further force and effect without Liability to either CDX Parties or Wallace Parties, or any of their respective Affiliates or Representatives, and each shall be fully released and discharged from any Liability under or resulting from this Agreement and the Parties shall have no other remedy or cause of action under or relating to this Agreement or any Applicable Law

9

including for reimbursement of expenses, except that the obligations of the Parties under <u>Section 6.1</u> and <u>6.6</u> and <u>Article X</u> shall remain in full force and effect.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF CDX PARTIES

CDX Parties hereby, jointly and severally, represent and warrant to Wallace Parties as follows:

Section 4.1    <u>Organization and Good Standing</u>. Each CDX Party is an entity duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the jurisdiction in which it was formed, and is duly qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, except where the failures to be so qualified or licensed could not be reasonably expected to have, individually or in the aggregate, a CDX Material Adverse Effect, and, subject to the limitations imposed on such CDX Party as a result of having filed a petition for relief under the Bankruptcy Code, or pursuant to any Order entered by the Bankruptcy Court, such CDX Party has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 4.2    <u>Authorization of Agreement</u>. Subject to the entry of the Bankruptcy Order, each CDX Party has the requisite power and authority to execute this Agreement and the Transaction Documents to which such CDX Party is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Transaction Documents to which such CDX Party is a party and the consummation by such CDX Party of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of such CDX Party. This Agreement and the Transaction Documents to which such CDX Party is a party have been duly executed and delivered by such CDX Party and, assuming due execution and delivery by the Wallace Parties and the entry of the Bankruptcy Order, constitute valid and binding obligations of such CDX Party, enforceable against such CDX Party in accordance with their respective terms.

Section 4.3    <u>No Violation; Consents</u>.

(a)    Except as set forth on <u>Schedule 4.3(a)</u> and subject to receiving all applicable consents and waivers (including those referred to in <u>Section 4.3(b)</u>), the execution and delivery by each CDX Party of this Agreement and the Transaction Documents to which such CDX Party is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the constituent documents of such CDX Party, (ii) subject to the entry of the Bankruptcy Order, conflict with, violate, result in the breach of, constitute a default under, or give rise to any right of acceleration, cancellation or termination of any material right or obligation of such CDX Party under, any Contract or other instrument to which such CDX Party is a party or by which such CDX Party or any of its properties or assets are bound (including Assumed CDX Contracts), (iii) subject to the entry of the Bankruptcy Order, violate any Order of any Governmental Authority to which such CDX Party is bound or subject, (iv) subject to the entry of the Bankruptcy Order, violate any Applicable Law, or (v) result in the imposition or creation of any Lien upon the CDX Transferred Assets, other than, in the case of clauses (ii) through (v), any conflict, violation, breach, default, cancellation, termination or Lien that could not be reasonably expected to have, individually or in the aggregate, a CDX Material Adverse Effect.

(b)    Except for the entry of the Bankruptcy Order and as set forth on <u>Schedule 4.3(b)</u>, no Order or Permit issued by, or declaration or filing with, or notification to, or waiver or consent from any Governmental Authority or other third party is required on the part of CDX Parties in connection with the execution and delivery of this Agreement or the Transaction Documents to which a CDX Party is a

10

party, or the compliance or performance by CDX Parties with any provision contained in this Agreement or the Transaction Documents to which a CDX Party is a party.

Section 4.4    Accredited Investor.   CDX Gas is an "accredited investor," as such term is defined in Regulation D of the Securities Act of 1933, as amended. CDX Gas is acquiring the Wallace Transferred Assets for its own account and not for distribution or resale in any manner that would violate any state or federal securities laws.

ARTICLE V
REPRESENTATIONS AND WARRANTIES OF WALLACE PARTIES

Wallace Parties hereby, jointly and severally, represents and warrant to CDX Parties as follows:

Section 5.1    Organization and Good Standing.   Each Wallace Party is an entity duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the jurisdiction in which it was formed, and is duly qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, except where the failures to be so qualified or licensed could not be reasonably expected to have, individually or in the aggregate, a Wallace Material Adverse Effect, and such Wallace Party has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Section 5.2    Authorization of Agreement.   Subject to the entry of the Bankruptcy Order, each Wallace Party has the requisite power and authority to execute this Agreement and the Transaction Documents to which such Wallace Party is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Transaction Documents to which such Wallace Party is a party and the consummation by such Wallace Party of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of such Wallace Party. This Agreement and the Transaction Documents to which such Wallace Party is a party have been duly executed and delivered by such Wallace Party and, assuming due execution and delivery by the CDX Parties and the entry of the Bankruptcy Order, constitute valid and binding obligations of such Wallace Party, enforceable against such Wallace Party in accordance with their respective terms.

Section 5.3    No Violation; Consents.

(a)    Except as set forth on Schedule 5.3(a) and subject to receiving all applicable consents and waivers (including those referred to in Section 5.3(b)), the execution and delivery by each Wallace Party of this Agreement and the Transaction Documents to which such Wallace Party is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the constituent documents of such Wallace Party, (ii) conflict with, violate, result in the breach of, constitute a default under, or give rise to any right of acceleration, cancellation or termination of any material right or obligation of such Wallace Party under, any Contract or other instrument to which such Wallace Party is a party or by which such Wallace Party or any of its properties or assets are bound (including Contracts constituting the Wallace Transferred Assets, if any), (iii) subject to the entry of the Bankruptcy Order, violate any Order of any Governmental Authority to which such Wallace Party is bound or subject, (iv) subject to the entry of the Bankruptcy Order, violate any Applicable Law, or (v) result in the imposition or creation of any Lien upon the Wallace Transferred Assets, other than, in the case of (ii) through (v), any conflict, violation, breach, default, cancellation, termination or Lien that could not be reasonably expected to have, individually or in the aggregate, a Wallace Material Adverse Effect.

11

(b)     Except for the entry of the Bankruptcy Order and as set forth on <u>Schedule 5.3(b)</u>, no Order or Permit issued by, or declaration or filing with, or notification to, or waiver or consent from any Governmental Authority or other third party is required on the part of Wallace Parties in connection with the execution and delivery of this Agreement or the Transaction Documents to which a Wallace Party is a party, or the compliance or performance by Wallace Parties with any provision contained in this Agreement or the Transaction Documents to which a Wallace Party is a party.

Section 5.4     <u>Accredited Investor</u>.   Calera Gas and Calera Gathering are both "accredited investors," as such term is defined in Regulation D of the Securities Act of 1933, as amended.   Calera Gas and, if applicable, Calera Gathering are acquiring the CDX Transferred Assets for their own account and not for distribution or resale in any manner that would violate any state or federal securities laws.

Section 5.5     <u>Owner of Wallace Transferred Assets</u>.   In December of 2008, Chama LP was merged into Wallace Associates which then became the survivor of the merger.   Accordingly, Wallace Associates is the owner of the Wallace Transferred Assets as of the effective date of this Agreement.

ARTICLE VI<br>COVENANTS

Section 6.1     <u>Access to Information</u>.

(a)     Prior to the Closing, CDX Parties shall permit Wallace Parties and their Representatives to have reasonable access, during normal business hours and upon reasonable advance written notice, to the properties, books, records and personnel of CDX Parties, to the extent related to the CDX Transferred Assets.   In connection with such access, Wallace Parties' Representatives shall cooperate with CDX Parties' Representatives and shall use their commercially reasonable efforts to minimize any disruption of the business of CDX Parties.   Wallace Parties agree to abide by any safety rules or rules of conduct reasonably imposed by CDX Parties with respect to such access and any information furnished to Wallace Parties or their Representatives pursuant to this <u>Section 6.1(a)</u>.   Wallace Parties further agree to maintain all information made available to them under this Agreement confidential and to cause their Representatives to maintain all information made available to them under this Agreement confidential, unless the disclosure of such information is required by Applicable Law, Order or obligations pursuant to any agreement with any national securities exchange or with respect to filings to be made with the Bankruptcy Court in connection with the Bankruptcy Cases; <u>provided</u>, that the Party intending to make such disclosure shall give the other Parties prior written notice and shall use its commercially reasonable efforts consistent with such Applicable Law, Order or obligation to consult with the other Parties with respect to the text of such disclosure.

(b)     Prior to the Closing, Wallace Parties shall permit CDX Parties and their Representatives to have reasonable access, during normal business hours and upon reasonable advance written notice, to the properties, books, records and personnel of Wallace Parties, to the extent related to the Wallace Transferred Assets.   In connection with such access, CDX Parties' Representatives shall cooperate with Wallace Parties' Representatives and shall use their commercially reasonable efforts to minimize any disruption of the business of Wallace Parties.   CDX Parties agree to abide by any safety rules or rules of conduct reasonably imposed by Wallace Parties with respect to such access and any information furnished to CDX Parties or their Representatives pursuant to this <u>Section 6.1(b)</u>.   CDX Parties further agree to maintain all information made available to them under this Agreement confidential and to cause their Representatives to maintain all information made available to them under this Agreement confidential, unless the disclosure of such information is required by Applicable Law, Order or obligations pursuant to any agreement with any national securities exchange or with respect to filings to be made with the Bankruptcy Court in connection with the Bankruptcy Cases; <u>provided</u>, that the

12

Party intending to make such disclosure shall give the other Parties prior written notice and shall use its commercially reasonable efforts consistent with such Applicable Law, Order or obligation to consult with the other Parties with respect to the text of such disclosure.

(c)     WALLACE PARTIES HEREBY INDEMNIFY, DEFEND AND HOLD HARMLESS CDX PARTIES FROM AND AGAINST ANY AND ALL LIABILITIES ASSERTED AGAINST OR SUFFERED BY CDX PARTIES RELATING TO, RESULTING FROM, OR ARISING OUT OF, EXAMINATIONS OR INSPECTIONS MADE BY WALLACE PARTIES OR THEIR REPRESENTATIVES PURSUANT TO SECTION 6.1(a).  CDX PARTIES HEREBY INDEMNIFY, DEFEND AND HOLD HARMLESS WALLACE PARTIES FROM AND AGAINST ANY AND ALL LIABILITIES ASSERTED AGAINST OR SUFFERED BY WALLACE PARTIES RELATING TO, RESULTING FROM, OR ARISING OUT OF, EXAMINATIONS OR INSPECTIONS MADE BY CDX PARTIES OR THEIR REPRESENTATIVES PURSUANT TO SECTION 6.1(b).   THE INDEMNIFICATION AND RELEASE PROVISIONS PROVIDED FOR IN THIS SECTION 6.1(c) SHALL BE APPLICABLE WHETHER OR NOT THE LOSS IN QUESTION AROSE OR RESULTED SOLELY OR IN PART FROM THE GROSS, SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OR VIOLATION OF APPLICABLE LAW.   THE PARTIES ACKNOWLEDGE THAT THIS STATEMENT COMPLIES WITH THE EXPRESS NEGLIGENCE RULE AND IS CONSPICUOUS.

Section 6.2     Contact with Vendors Pending Closing.  Prior to the Closing, CDX Parties shall use commercially reasonable efforts to permit Wallace Parties and their Representatives to have access to CDX Parties' vendors associated with the CDX Transferred Assets for the purpose of making reasonable inquiries with those vendors in order that Wallace Parties may establish their own business relationships with those vendors in contemplation of the Closing and to make the transition of those vendor relationships to Wallace Parties as seamless as possible.

Section 6.3     Conduct of Business Pending the Closing.

(a)     Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Wallace Parties (which consent shall not be unreasonably withheld, delayed or conditioned), and except for any violations that could not be reasonably expected to have, individually or in the aggregate, a CDX Material Adverse Effect, during the period from the date hereof to and through the Closing Date, CDX Parties shall (subject to receipt of the Bankruptcy Order) use commercially reasonable efforts to preserve the CDX Transferred Assets.

(b)     Except as otherwise expressly contemplated by this Agreement or with the prior written consent of CDX Parties (which consent shall not be unreasonably withheld, delayed or conditioned), and except for any violations that could not be reasonably expected to have, individually or in the aggregate, a Wallace Material Adverse Effect, during the period from the date hereof to and through the Closing Date, Wallace Parties shall use commercially reasonable efforts to preserve the Wallace Transferred Assets.

Section 6.4     Appropriate Action.  From the date hereof until the Closing, the Parties shall cooperate with each other and use commercially reasonable efforts (subject, in the case of CDX Parties, to receipt of the Bankruptcy Order) (a) to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on their part under this Agreement, Applicable Law or otherwise to consummate and make effective the transactions contemplated hereby, (b) to obtain promptly from any Governmental Authority any Orders or Permits required to be obtained by the Parties or any of their respective Affiliates in connection with the authorization, execution, delivery and performance of this Agreement and the consummation of the transactions contemplated

13

hereby, (c) to promptly make all necessary filings and thereafter make any other required submissions with respect to this Agreement and prompt consummation of the transactions contemplated hereby required under any Applicable Law, (d) to provide prompt notification to the other Parties of any actions pursuant to clauses (a) through (c) of this Section 6.4.

Section 6.5    Bankruptcy Matters.  CDX Parties shall file with the Bankruptcy Court one or more motions which, collectively, seek the entry of the Bankruptcy Order.  CDX Parties and Wallace Parties shall use commercially reasonable efforts to cooperate, assist and consult with each other to secure the entry of the Bankruptcy Order following the date hereof, and to consummate the transactions contemplated hereby.  In the event the Bankruptcy Order relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bankruptcy Order), CDX Parties and Wallace Parties will cooperate in taking such steps to diligently defend against such appeal, petition or motion and CDX Parties and Wallace Parties shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.  Wallace Parties shall not, without the prior written consent of CDX Parties, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the CDX Transferred Assets other than those motions or pleadings filed by CDX Parties.

Section 6.6    Public Announcements.  Prior to the Closing Date, no Party nor any of its respective Affiliates nor any of their Representatives, shall issue any press release or public statement concerning this Agreement or the Transaction Documents or the transactions contemplated hereby or thereby without obtaining the prior written approval of the other Parties, unless such disclosure is required by Applicable Law, Order or obligations pursuant to any agreement with any national securities exchange or with respect to filings to be made with the Bankruptcy Court in connection with the Bankruptcy Cases; provided, that the Party intending to make such release shall give the other Parties prior written notice and shall use its commercially reasonable efforts consistent with such Applicable Law, Order or obligation to consult with the other Parties with respect to the text thereof.

Section 6.7    Further Assurances; Intent of the Parties.  The Parties agree that from and after the Closing Date, each of them shall, and shall cause their respective Affiliates to, execute and deliver such further instruments of conveyance and transfer and take such other action as may reasonably be requested by any Party to carry out the purposes and intents hereof, at the cost and expense of the requesting Party.  It is the intent of the Parties that Wallace Associates transfers, assigns and delivers to CDX Gas all of the oil and gas properties that Wallace Associates or any of its Affiliates owns in the State of West Virginia as of the Closing Date.  It is the intent of the Parties that CDX Gathering, CDX Bishop Creek and CDX Sequoya transfer, assign and deliver to Calera Gas and, if applicable, Calera Gathering all of their assets as of the Closing Date.  It is the intent of the Parties that CDX Gas and CD Exploration transfer, assign and deliver to Calera Gas the CDX Transferred Assets consisting only of the CDX Leases under which they are lessees and which are located in Bibb and Shelby Counties, Alabama as of the Closing Date.

Section 6.8    Third Party Consents.

(a)    With respect to any approval or consent required to be obtained in connection with the consummation of the transactions contemplated hereunder with respect to the CDX Transferred Assets, as soon as practicable after execution of this Agreement, CDX Parties shall use commercially reasonable efforts to obtain any third party approvals or consents to the transactions contemplated herein with respect to the CDX Transferred Assets, and Wallace Parties shall reasonably cooperate with CDX Parties' efforts to obtain such approvals or consents.

14

(b)     With respect to any approval or consent required to be obtained in connection with the consummation of the transactions contemplated hereunder with respect to the Wallace Transferred Assets, as soon as practicable after execution of this Agreement, Wallace Parties shall use commercially reasonable efforts to obtain any third party approvals or consents to the transactions contemplated herein with respect to the Wallace Transferred Assets, and CDX Parties shall reasonably cooperate with Wallace Parties' efforts to obtain such approvals or consents.

Section 6.9     Governmental Bonds.

(a)     Wallace Parties acknowledge that none of the bonds, letters of credit and guarantees, if any, posted by CDX Parties or their Affiliates with the Governmental Authorities and relating to the CDX Transferred Assets, are transferrable or are to be transferred to Wallace Parties.  On or before the Closing Date, Wallace Parties shall obtain, or cause to be obtained in the name of Calera Gas or its designee, replacements for such bonds, letters of credit and guarantees to the extent such replacements are necessary to permit the cancellation of bonds, letters of credit and guarantees posted by CDX Parties or their Affiliates.  In addition, at or prior to the Closing, Wallace Parties shall deliver to CDX Parties evidence of the posting of bonds, letters of credit, guarantees or other security with all applicable Governmental Authorities meeting the requirements of such Governmental Authorities to own and, where appropriate, to operate, the CDX Transferred Assets.

(b)     CDX Parties acknowledge that none of the bonds, letters of credit and guarantees, if any, posted by Wallace Parties or their Affiliates with the Governmental Authorities and relating to the Wallace Transferred Assets, are transferrable or are to be transferred to CDX Parties.  On or before the Closing Date, CDX Parties shall obtain, or cause to be obtained in the name of CDX Gas or its designee, replacements for such bonds, letters of credit and guarantees to the extent such replacements are necessary to permit the cancellation of bonds, letters of credit and guarantees posted by Wallace Parties or their Affiliates.  In addition, at or prior to the Closing, CDX Parties shall deliver to Wallace Parties evidence of the posting of bonds, letters of credit, guarantees or other security with all applicable Governmental Authorities meeting the requirements of such Governmental Authorities to own and, where appropriate, to operate, the Wallace Transferred Assets.

Section 6.10     Transfer Taxes.

(a)     All sales, transfer, filing, recordation, registration, documentary, stamp, and similar Taxes and fees (collectively, "Transfer Taxes") arising from or associated with the assignment of the CDX Transferred Assets from CDX Parties to Calera Gas and, if applicable, Calera Gathering, whether levied on CDX Parties or Wallace Parties, shall be borne by Wallace Parties.  Wallace Parties shall, at their own cost and expense, file any necessary Tax Returns and other documentation with respect to any Transfer Taxes and provide to CDX Parties evidence of filing and payment of all such Transfer Taxes.

(b)     All Transfer Taxes arising from or associated with the assignment of the Wallace Transferred Assets from Wallace Associates to CDX Gas, whether levied on CDX Parties or Wallace Parties, shall be borne by CDX Parties.  CDX Parties shall, at their own cost and expense, file any necessary Tax Returns and other documentation with respect to any Transfer Taxes and provide to Wallace Parties evidence of filing and payment of all such Transfer Taxes.

(c)     Wallace Parties and CDX Parties shall cooperate in good faith to minimize, to the extent permissible under the Applicable Law, the amount of any Transfer Taxes.

Section 6.11     Property Taxes.

15

(a)    All ad valorem, property and similar Taxes ("Property Taxes") assessed with respect to the CDX Transferred Assets shall be prorated between the Parties based on their relative number of days of ownership of the CDX Transferred Assets during the taxable year of which the Closing Date is a part. CDX Parties shall pay to Wallace Parties at Closing CDX Parties' share of such Property Taxes. To the extent the actual amount of Property Taxes is not determinable at Closing, the Parties shall utilize the most recent information available in estimating the amount to be paid by CDX Parties at Closing. Upon determination of the actual amount of Property Taxes, CDX Parties shall pay to Wallace Parties any additional amount necessary to equal CDX Parties' share of the Property Taxes; in the event the amount paid by CDX Parties at Closing exceeds CDX Parties' share of Property Taxes, Wallace Parties shall refund any such overage to CDX Parties.

(b)    All Property Taxes assessed with respect to the Wallace Transferred Assets shall be prorated between the Parties based on their relative number of days of ownership of the Wallace Transferred Assets during the taxable year of which the Closing Date is a part. Wallace Parties shall pay to CDX Parties at Closing Wallace Parties' share of such Property Taxes. To the extent the actual amount of Property Taxes is not determinable at Closing, the Parties shall utilize the most recent information available in estimating the amount to be paid by Wallace Parties at Closing. Upon determination of the actual amount of Property Taxes, Wallace Parties shall pay to CDX Parties any additional amount necessary to equal Wallace Parties' share of the Property Taxes; in the event the amount paid by Wallace Parties at Closing exceeds Wallace Parties' share of Property Taxes, CDX Parties shall refund any such overage to Wallace Parties.

Section 6.12    Tax Reporting.  To the extent required by Treasury Regulation section 1.1060-1(b)(8), the Parties shall reasonably cooperate with one another in making any appropriate and necessary filings with the Internal Revenue Service in respect of the transactions contemplated by this Agreement.

ARTICLE VII
CONDITIONS TO CLOSING

Section 7.1    Conditions Precedent to Obligations of All Parties.  The respective obligations of CDX Parties, on the one hand, and Wallace Parties, on the other hand, to consummate the transactions contemplated hereby are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions:

(a)    there shall not be in effect any Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)    the Bankruptcy Court shall have entered the Bankruptcy Order approving this Agreement in the Bankruptcy Cases.

Section 7.2    Conditions Precedent to Obligations of CDX Parties.  The obligation of CDX Parties to consummate the transactions contemplated hereby is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by CDX Parties, in whole or in part, subject to Applicable Law):

(a)    The representations and warranties of Wallace Parties contained herein shall be true and correct (disregarding any materiality qualifiers, including the Wallace Material Adverse Effect) as of the Closing Date as though made on and as of the Closing Date, except for such breaches, if any, that in the aggregate could reasonably be expected to have a Wallace Material Adverse Effect;

16

(b)     Wallace Parties shall have performed and complied in all material respects with all material obligations and covenants required by this Agreement to be performed or complied with by Wallace Parties on or prior to the Closing Date;

(c)     CDX Parties shall have obtained the waivers and/or consents listed on Schedule 4.3(b); and

(d)     Wallace Parties shall be ready, willing and able to deliver to CDX Parties the documents referred to in Section 8.2 and W. Ray Wallace shall have co-signed that certain Assignment contemplated by Section 8.2(a).

Section 7.3     Conditions Precedent to Obligations of Wallace Parties.   The obligation of Wallace Parties to consummate the transactions contemplated hereby is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Wallace Parties, in whole or in part, subject to Applicable Law):

(a)     The representations and warranties of CDX Parties contained herein shall be true and correct (disregarding any materiality qualifiers, including the CDX Material Adverse Effect) as of the Closing Date as though made on and as of the Closing Date, except for such breaches, if any, that in the aggregate could reasonably be expected to have a CDX Material Adverse Effect;

(b)     CDX Parties shall have performed and complied in all material respects with all material obligations and covenants required by this Agreement to be performed or complied with by CDX Parties on or prior to the Closing Date; and

(c)     CDX Parties shall be ready, willing and able to deliver to Wallace Parties the documents referred to in Section 8.1.

ARTICLE VIII<br>DOCUMENTS TO BE DELIVERED

Section 8.1     Documents to Be Delivered by CDX Parties.   At the Closing, the applicable CDX Parties shall deliver, or cause to be delivered, to Wallace Parties the following:

(a)     duly executed and acknowledged Assignment (in sufficient counterparts for recordation purposes) of each CDX Party conveying the CDX Transferred Assets and such other instruments of conveyance reasonably necessary for the transfer of the CDX Transferred Assets, in each case, to Calera Gas and, if applicable, Calera Gathering;

(b)     duly executed and acknowledged counterparts of the Assignment conveying the Wallace Transferred Assets and such other instruments of conveyance reasonably necessary for the transfer of the Wallace Transferred Assets, in each case, to CDX Gas;

(c)     duly executed change of operator forms for filing with applicable Governmental Authorities prepared by CDX Parties in form and substance reasonably acceptable to Wallace Parties for each of the CDX Leases, the CDX Lands and the CDX Wells for which any CDX Party or any of its Affiliates act as operator evidencing a transfer to Calera Gas (or its designee) of operations on all such CDX Leases, CDX Lands and CDX Wells;

(d)     a certified copy of the Bankruptcy Order;

17

(e)     a certificate of each CDX Party certifying that the closing conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied;

(f)     an affidavit of non-foreign status of each CDX Party that complies with section 1445 of the Code; and

(g)     such additional documents customary in similar transactions as may be reasonably requested by Wallace Parties to consummate the transactions contemplated by this Agreement.

Section 8.2     Documents to Be Delivered by Wallace Parties.  At the Closing, the applicable Wallace Parties shall deliver, or cause to be delivered, to CDX Parties the following:

(a)     duly executed and acknowledged Assignment (in sufficient counterparts for recordation purposes) of Wallace Associates conveying the Wallace Transferred Assets and such other instruments of conveyance reasonably necessary for the transfer of the Wallace Transferred Assets, in each case, to CDX Gas;

(b)     duly executed and acknowledged counterparts of the Assignment conveying the CDX Transferred Assets and such other instruments of conveyance reasonably necessary for the transfer of the CDX Transferred Assets, in each case, to Calera Gas and, if applicable, Calera Gathering;

(c)     a certificate of each Wallace Party certifying that the closing conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied;

(d)     an affidavit of non-foreign status of each Wallace Party that complies with section 1445 of the Code; and

(e)     such additional documents customary in similar transactions as may be reasonably requested by CDX Parties to consummate the transactions contemplated by this Agreement.

Section 8.3     Assignment of Wallace Transferred Assets to Be Executed by W. Ray Wallace. At the Closing, the Wallace Parties shall cause W. Ray Wallace to co-sign that certain Assignment contemplated by Section 8.2(a).


ARTICLE IX
LIMITATIONS

Section 9.1     LIMITATION OF REPRESENTATIONS AND WARRANTIES.

(a)     EXCEPT   FOR   THE   REPRESENTATIONS   AND   WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV AND THE CERTIFICATE DELIVERED PURSUANT TO SECTION 8.1(e), CDX PARTIES ARE NOT MAKING ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, CONCERNING CDX PARTIES, THE CDX TRANSFERRED ASSETS OR LIABILITIES OF CDX PARTIES AND IT IS UNDERSTOOD THAT WALLACE PARTIES TAKE THE CDX TRANSFERRED ASSETS "AS IS" AND   "WHERE IS".   WALLACE PARTIES ACKNOWLEDGE THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV AND THE CERTIFICATE DELIVERED PURSUANT TO SECTION 8.1(e), CDX PARTIES HAVE NOT MADE, AND CDX PARTIES HEREBY EXPRESSLY DISCLAIM AND NEGATE, AND WALLACE

18

PARTIES HEREBY EXPRESSLY WAIVE, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO, AND WALLACE PARTIES HEREBY EXPRESSLY WAIVE AND RELINQUISH ANY AND ALL RIGHTS, CLAIMS AND CAUSES OF ACTION AGAINST CDX PARTIES AND THEIR AFFILIATES AND EACH OF THEIR RESPECTIVE REPRESENTATIVES IN CONNECTION WITH, THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO WALLACE PARTIES OR THEIR REPRESENTATIVES BY OR ON BEHALF OF CDX PARTIES OR ANY OF THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE REPRESENTATIVES IN CONNECTION THEREWITH. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV AND THE CERTIFICATE DELIVERED PURSUANT TO SECTION 8.1(e) AND WITHOUT LIMITING THE FOREGOING, CDX PARTIES ARE NOT MAKING ANY REPRESENTATION OR WARRANTY TO WALLACE PARTIES WITH RESPECT TO ANY FINANCIAL PROJECTION OR FORECAST RELATING TO THE CDX TRANSFERRED ASSETS OR LIABILITIES OF CDX PARTIES.  WITH RESPECT TO ANY PROJECTION OR FORECAST DELIVERED ON BEHALF OF CDX PARTIES TO WALLACE PARTIES OR THEIR REPRESENTATIVES, WALLACE PARTIES ACKNOWLEDGE THAT (I) THERE ARE UNCERTAINTIES INHERENT IN ATTEMPTING TO MAKE SUCH PROJECTIONS AND FORECASTS, (II) WALLACE PARTIES ARE FAMILIAR WITH SUCH UNCERTAINTIES, (III) WALLACE PARTIES ARE TAKING FULL RESPONSIBILITY FOR MAKING THEIR OWN EVALUATION OF THE ADEQUACY AND ACCURACY OF ALL SUCH PROJECTIONS AND FORECASTS FURNISHED TO THEM, AND (IV) WALLACE PARTIES SHALL HAVE NO CLAIM AGAINST CDX PARTIES OR THEIR AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES WITH RESPECT THERETO.

(b)     EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE V AND THE CERTIFICATE DELIVERED PURSUANT TO SECTION 8.2(c), WALLACE PARTIES ARE NOT MAKING ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, CONCERNING WALLACE PARTIES, THE WALLACE TRANSFERRED ASSETS OR LIABILITIES OF WALLACE PARTIES AND IT IS UNDERSTOOD THAT CDX PARTIES TAKE THE WALLACE TRANSFERRED ASSETS "AS IS" AND "WHERE IS".  CDX PARTIES ACKNOWLEDGE THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE V AND THE CERTIFICATE DELIVERED PURSUANT TO SECTION 8.2(c), WALLACE PARTIES HAVE NOT MADE, AND WALLACE PARTIES HEREBY EXPRESSLY DISCLAIM AND NEGATE, AND CDX PARTIES HEREBY EXPRESSLY WAIVE, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO, AND CDX PARTIES HEREBY EXPRESSLY WAIVE AND RELINQUISH ANY AND ALL RIGHTS, CLAIMS AND CAUSES OF ACTION AGAINST WALLACE PARTIES AND THEIR AFFILIATES AND EACH OF THEIR RESPECTIVE REPRESENTATIVES IN CONNECTION WITH THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO CDX PARTIES OR THEIR REPRESENTATIVES BY OR ON BEHALF OF WALLACE PARTIES OR ANY OF THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE REPRESENTATIVES IN CONNECTION THEREWITH.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE V AND THE CERTIFICATE DELIVERED PURSUANT TO SECTION 8.2(c) AND WITHOUT LIMITING THE FOREGOING, WALLACE PARTIES ARE NOT MAKING ANY REPRESENTATION OR WARRANTY TO CDX PARTIES WITH RESPECT TO ANY FINANCIAL PROJECTION OR FORECAST RELATING TO THE WALLACE TRANSFERRED ASSETS OR LIABILITIES OF WALLACE PARTIES.  WITH RESPECT TO ANY PROJECTION OR FORECAST DELIVERED ON BEHALF OF WALLACE

19

PARTIES TO CDX PARTIES OR THEIR REPRESENTATIVES, CDX PARTIES ACKNOWLEDGE THAT (I) THERE ARE UNCERTAINTIES INHERENT IN ATTEMPTING TO MAKE SUCH PROJECTIONS AND FORECASTS, (II) CDX PARTIES ARE FAMILIAR WITH SUCH UNCERTAINTIES, (III) CDX PARTIES ARE TAKING FULL RESPONSIBILITY FOR MAKING THEIR OWN EVALUATION OF THE ADEQUACY AND ACCURACY OF ALL SUCH PROJECTIONS AND FORECASTS FURNISHED TO THEM, AND (IV) CDX PARTIES SHALL HAVE NO CLAIM AGAINST WALLACE PARTIES OR THEIR AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES WITH RESPECT THERETO.

Section 9.2    NO CONSEQUENTIAL OR PUNITIVE DAMAGES.  NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTIES (OR THEIR AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTIES UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF PROFIT, REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

Section 9.3    CONSPICUOUS.  THE PARTIES AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS AND LIMITATIONS SET FORTH IN THIS ARTICLE IX ARE "CONSPICUOUS" DISCLAIMERS AND LIMITATIONS FOR THE PURPOSE OF ANY APPLICABLE LAW.

ARTICLE X
MISCELLANEOUS

Section 10.1    Nonsurvival of Representations and Warranties.  No representation or warranty or pre-Closing covenant of any Party made herein, in any Transaction Document or in any other instrument or document delivered pursuant to this Agreement (including the certificates delivered pursuant to Section 8.1(e) or Section 8.2(c)) shall survive beyond the Closing; and, from and after the Closing, there shall be no Liability in respect thereof, whether such Liability has accrued prior to or after the Closing, on the part of any Party or any of its Representatives.

Section 10.2    Intentionally Omitted.

Section 10.3    Costs and Expenses.  Except as otherwise set forth in this Agreement, CDX Parties, on the one hand, and Wallace Parties, on the other hand, shall bear their own costs and expenses (including legal fees) incurred in connection with the negotiation and execution of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

Section 10.4    Submission to Jurisdiction.

(a)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all Actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.9; provided, however, that if the Bankruptcy Cases have been fully and finally dismissed, the Parties agree to and hereby unconditionally and irrevocably submit to the

exclusive jurisdiction of the United States District Court for the Southern District of Texas and any appellate court from thereof, for the resolution of any such claim or dispute.

        (b)      The Parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby brought in any court specified in Section 10.4(a), or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

        (c)      Each of the Parties hereby consents to process being served by any Party in any Action by the mailing of a copy thereof in accordance with the provisions of Section 10.9; provided, however, that such service shall not be effective until the actual receipt thereof by the Party being served.

        Section 10.5    Waiver of Jury Trial.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF AN ACTION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.5.

        Section 10.6    Time of Essence.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

        Section 10.7    Entire Agreement; Amendments; Waivers.  This Agreement (including the Exhibits and Schedules) and the Transaction Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. This Agreement supersedes that certain Term Sheet (CDX/Wallace Exchange of West Virginia Interests for Cahaba), dated as of March 6, 2009 (as amended), which Term Sheet shall be of no further force or effect. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

        Section 10.8    GOVERNING LAW.  THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, ENFORCED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO CONFLICT OF LAW, RULES

AND PRINCIPLES WHICH REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

Section 10.9    Notices.  All notices and other communications under this Agreement shall be in writing and shall be deemed duly given (a) when delivered personally or by prepaid overnight courier, with a record of receipt, (b) the third (3rd) day after mailing if mailed by certified mail, return receipt requested, or (c) the day of transmission, if sent by facsimile or telecopy during regular business hours or the Business Day after transmission, if sent after regular business hours (with a copy promptly sent by prepaid overnight courier with record of receipt or by certified mail, return receipt requested), to the Parties at the following addresses or facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Parties pursuant to this provision):

If to CDX Parties:

> CDX Gas, LLC
> 1001 McKinney, Suite 1600
> Houston, TX 77002
> Attention: President
> Fax: 713-346-2501

With a copy to:

> Vinson and Elkins LLP
> Trammell Crow Center
> 2001 Ross Avenue
> Suite 3700
> Dallas, TX 75201
> Attention: John E. Mitchell
> Fax: 214-999-7766

If to Wallace Parties:

> 5500 Preston Rd., Ste. 220
> Dallas, Texas 75205
> Phone: 214-526-6364
> Fax: 214-526-6446
> Attention: Mr. W. Ray Wallace

With a copy to:

> Kennedy Legal Firm PLLC
> 2911 Turtle Creek Blvd., Ste. 450
> Dallas, Texas 75219
> Phone: 214-559-9600
> Fax: 214-559-9641
> Attention: Keith W. Kennedy

Section 10.10    Severability.  If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by law or public policy, all other terms and provisions hereof shall nevertheless remain in full force and effect so long as the legal and economic substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon

22

such determination that any term or provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 10.11    Binding Effect; Assignment.   This Agreement shall be binding solely upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Other than with respect to Section 6.1(c) and Section 10.2, nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a Party to this Agreement.  Except as provided in Section 2.1(d), no assignment of this Agreement or of any rights or obligations hereunder may be made by any Party (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void.

Section 10.12    Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 10.13    Authorization by CDX Parties.   CDX Parties hereby irrevocably authorize and empower CDX Gas to make or give any approval, waiver, request, consent, instruction or other communication on behalf of CDX Parties with respect to this Agreement or the transactions contemplated hereby, including with respect to the amendment of any provision hereof.  CDX Parties hereby irrevocably authorize and empower CDX Gas to receive all demands, notices or other communicates directed to CDX Parties under this Agreement.  CDX Parties hereby irrevocably authorize and empower CDX Gas to (a) take any action (or to determine to refrain from taking any action) in connection with the transactions contemplated by this Agreement as CDX Gas may deem appropriate (including the settlement or compromise of any dispute or controversy), which action (or determination to refrain from taking any action) will be binding on CDX Parties and (b) execute and deliver all instruments and documents of every kind incident to the foregoing with the same effect as if CDX Parties had executed and delivered such instruments and documents themselves.  Accordingly, any demands, notices or other communications directed to CDX Parties under this Agreement shall be deemed effective if properly given to CDX Gas, and Wallace Parties shall have no Liability to any CDX Party for complying with any communications or notices of CDX Gas.  For the avoidance of doubt, notwithstanding the foregoing, each CDX Party shall execute and deliver the Assignment with respect to the CDX Transferred Assets at the Closing.

*[The remainder of this page is intentionally left blank.]*

23

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

## CDX PARTIES:

CAHABA GATHERING, LLC

By: *Michael McCown*
Name: Michael McCown
Title: Vice President


CDX BISHOP CREEK, LLC

By: *Michael McCown*
Name: Michael McCown
Title: Vice President


CDX SEQUOYA, LLC

By: *Michael McCown*
Name: Michael McCown
Title: Vice President


CDX GAS, LLC

By: *Michael McCown*
Name: Michael McCown
Title: Eexutive Vice President


CD EXPLORATION, LLC

By: *Michael McCown*
Name: Michael McCown
Title: Vice President


SIGNATURE PAGE TO EXCHANGE AGREEMENT

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

### WALLACE PARTIES:

CALERA GAS, LLC,
a Nevada limited liability company

By: _____
Name: W. Ray Wallace
Title: Manager


CALERA GATHERING, LLC,
a Nevada limited liability company

By: _____
Name: W. Ray Wallace
Title: Manager


WALLACE ASSOCIATES II,
a Texas general partnership

By: _____
Name: W. Ray Wallace
Title: Managing General Partner


SIGNATURE PAGE TO EXCHANGE AGREEMENT

Exhibit A – Part 1
CDX Leases

**[Attached behind this page.]**

## Exhibit A - Part 1 - CDX Leases

| Lease | Lessor | Lessee | Lease Date | County | State | Book | Page | Description (In the case of conflict between the description in this column and the description in the underlying instrument, the description in the underlying instrument shall control) |
|---|---|---|---|---|---|---|---|---|
| 0001A001-0001 | GULF STATES PAPER CORPORATION | CDX SEQUOIA LLC | 2/9/2004 | BIBB | AL | 147 | 186 | **BIBB CO., AL**<br>T21S R5W, SEC 22 SE<br>T21S R5W, SEC 23 NE NE SE, S2 SW<br>SE NW, SW, SEC 26 N2 NW, SW NW, N2 SW (FEE)<br>SW SE, S2 SW (MIN RTS)<br>T21S R5W, SEC 27 ALL<br>T21S R5W, SEC 28 E2 SE<br>T21S R5W, SEC 32 E2 SE SW, S2, S2 NE SE (FEE)<br>SW SW, W2 SE SW (MIN RTS)<br>T21S R5W, SEC 33 N2 NW, NE, NE SE, S2 S2 (FEE)<br>SE NW, NW SE (MIN RTS)<br>T21S R5W, SEC 34 NW NW, S2 NW, NW NE, W2 SW (PART FEE)<br>SE, W2 SW (PART MIN RTS)<br>T21S R5W, SEC 35 W2, SE, W2 NE<br>T21S R5W, SEC 36, SW SW, NW SW (2/3 INT)<br>T22S R4W, SEC 8 E2 SW, W2 SE, NE NW, SW NW, N2 NE, SE NE, E2 SW NE (FEE)<br>SW NE, W2 SW NE (MIN INT)<br>T22S R5W, SEC 2 NW NW, SW (FEE), SW NW, NW SW, W2 SE (MIN INT)<br>T22S R5W, SEC 3 NW NE, E2 SE<br>T22S R5W, SEC 4, N2, SE<br>T22S R5W, SEC 10 N2, SW<br>T22S R5W, SEC 16 ALL<br><br>**SHELBY CO., AL**<br>T21S R5W, SEC 23 SE SE<br>T21S R5W, SEC 24 NE NW, S2 N2, NW SE, THAT PART OF THE SE SE THAT LIES N & E OF CAHABA RIVER, S2 SW (FEE)<br>NE SE, THAT PART OF THE SE SE THAT LIES S&W OF CAHABA RIVER (MIN RTS)<br>T21S R5W, SEC 26 E2 E2, NW SE SW<br>T21S R5W, SEC 26 THAT PART OF E2 NE LYING W OF SHADES CREEK (FEE)<br>THAT PART OF E2 NE LYING W OF SHADES CREEK (MIN RTS)<br>T22S R5W, SEC 3 S SE NE<br>T22S R5W, SEC 4 NE SE<br>T22S R4W, SEC 9, SW, NW SE (FEE)<br>SE NE, E2 SE, SW SE (MIN INT)<br>T22S R4W, SEC 10, W2 NW, NE NW, SW SW |

Exhibit A - Part 1 - CDX Leases

| Lease | Lessee | Lessee | Lease Date | County | State | Book | Page | Description |
|---|---|---|---|---|---|---|---|---|
| 4001 44.001 4.001 | GULF STATES PAPER CORPORATION | CDX SEQUOIA LLC | 2/9/2004 | Bibb | AL | 220 | 388 | BIBB CO, AL<br>T21S R5W, SEC 22, SE<br>T21S R5W, SEC 23, NE, NE SE, S2 SW<br>T21S R5W, SEC 26, N2 NW, SW NW, N2 SW (FEE)<br>SW SE, S2 SW (MIN RTS)<br>T21S R5W, SEC 27, ALL<br>T21S R5W, SEC 28, E2 SE<br>T21S R5W, SEC 32, E2 E2 SE SW, S2 SE, S2 NE SE (FEE)<br>SW SW, W2 SE SW (MIN RTS)<br>T21S R5W, SEC 33, N2 NW, NE, NE SE, S2 S2 (FEE)<br>SE NW, NW SE (MIN RTS)<br>T21S R5W, SEC 34, NW NW, S2 NW, NW NE, W2 SW (PART FEE)<br>SE, W2 SW (PART) (MIN RTS)<br>T21S R5W, SEC 35, W2, SE, W2 NE<br>T21S R5W, SEC 36, SW SW, NW SW (N2/3 INT)<br>T22S R4W, SEC 8, E2 SW, W2 SE, NE NW, SW NW, N2 NE, E2 SW NE (FEE)<br>SE NW, W2 SW NE (MIN INT)<br>T22S R5W, SEC 2, NW NW, SW SW (FEE), SW NW, NW SW, NE NW, W2 SE (MIN INT)<br>T22S R5W, SEC 3, NW NE, E2 SE<br>T22S R5W, SEC 4, N2 SE<br>T22S R5W, SEC 10, N2 SW<br>T22S R5W, SEC 16, ALL<br><br>SHELBY CO, AL<br>T21S R5W, SEC 23, SE SE<br>T21S R5W, SEC 24, NE NW, S2 N2, NW SE, THAT PART OF THE SE SE THAT LIES N & E OF CAHABA RIVER, S2 SW (FEE)<br>NE SE, THAT PART OF THE SE SE THAT LIES SW OF CAHABA RIVER (MIN RTS)<br>T21S R5W, SEC 25, E2 E2, NW SE, N4<br>T21S R5W, SEC 26, THAT PART OF E2 NE LYING E OF SHADES CREEK (FEE)<br>THAT PART OF E2 NE LYING W OF SHADES CREEK (MIN RTS)<br>T21S R5W, SEC 35, SE NE<br>T22S R4W, SEC 4, NE SE<br>T22S R4W, SEC 9, SW, NW SE (FEE)<br>SE NE, E2 SE, SW SE (MIN INT)<br>T22S R4W, SEC 10, W2 NW, NE NW, SW SW |

## Exhibit A - Part 1 - CDX Leases

| Lease | Lessor | Lessee | Lease Date | County | State | Book | Page | Description |
|---|---|---|---|---|---|---|---|---|
| 0001-14-001-001 | GULF STATES PAPER CORPORATION | CDX SEQUOYA LLC | 2/7/2004 | Shelby | AL | | | BIBB CO, AL<br>T21S R5W, SEC 22 SE<br>T21S R0W, SEC 23 NE, NE SE, S2 SW<br>T21S R5W, SEC 26 N2 NW, SW NW, N2 SW (FEE)<br>SW SE, S2 SW (MIN RTS)<br>T21S R5W, SEC 27 ALL<br>T21S R5W, SEC 28 E2 SE<br>T21S R5W, SEC 32 E2 SE SW, S2 SE, S2 NE SE (FEE)<br>SW SW, W2 SE SW (MIN RTS)<br>T21S R5W, SEC 33 N2 NW, NE, NE SE, S2 S2 (FEE)<br>SE NW, SE SW (MIN RTS)<br>T21S R5W, SEC 34 NW NW, S2 NW, NW NE, W2 SW (PART FEE)<br>SE, W2 SW (PART MIN RTS)<br>T21S R5W, SEC 35 W2, SE, W2 NE<br>T21S R5W, SEC 36 SW SW, NW SW (1/2 INT)<br>T22S R4W, SEC 8 E2 SW, W2 SE, NE NW, SW NW, N2 NE, SE NE, E2 SW NE (FEE)<br>SE NW, W2 SW NE (MIN INT)<br>T22S R5W, SEC 2 NW NW, SW SW (FEE), SW NW, NW SW, NE NW, W2 SE (MIN INT)<br>T22S R5W, SEC 3 NW NE, E2 SE<br>T22S R5W, SEC 4 N2, SE<br>T22S R5W, SEC 10 N2, SW<br>T22S R5W, SEC 16 ALL<br><br>SHELBY CO, AL<br>T21S R3W, SEC 23 SE SE<br>T21S R3W, SEC 24 NE NW, S2 N2, NW SE, THAT PART OF THE SE SE THAT LIES N & E OF CAHABA RIVER, S2<br>SW (FEE)<br>NE SE, THAT PART OF THE SE SE THAT LIES S&W OF CAHABA RIVER (MIN RTS)<br>T21S R3W, SEC 25 E2 E2, NW SE, SW<br>T21S R3W, SEC 26 THAT PART OF E2 NE LYING E OF SHADES CREEK (FEE)<br>THAT PART OF E2 NE LYING W OF SHADES CREEK (MIN RTS)<br>T21S R3W, SEC 35 SE NE<br>T22S R4W, SEC 4 NE SE<br>T22S R5W, SEC 0 SW, NW SE (FEE)<br>SE NE, E2 SE, SW SE (MIN INT)<br>T22S R4W, SEC 10, W2 NW, NE NW, SW SW |

Exhibit A - Part 1 - CDX Leases

| Lease | Lessor | Lessee | Lease Date | County | State | Book | Page | Description |
|---|---|---|---|---|---|---|---|---|
| 00014-001-001 | GULF STATES PAPER CORPORATION | CDX SEQUOYA LLC | 2/9/2004 | SHELBY | AL | | | BIBB CO. AL<br>T21S R5W, SEC 22 SE<br>T21S R5W, SEC 23 NE, N2 SE, S2 SW<br>T21S R5W, SEC 26 N2 NW, SW NW, N2 S W (FEE)<br>SW SE, S2 SW (MIN RTS)<br>T21S R5W, SEC 27, ALL<br>T21S R5W, SEC 28 E2 SE<br>T21S R5W, SEC 32 E2 E2 SW, S2 SE, S2 NE SE (FEE)<br>SW SW, W2 SE SW (MIN RTS)<br>SE NW, NW SE (MIN RTS)<br>T21S R5W, SEC 34 NW NW, S2 NW, NW NE, W2 SW (PART FEE)<br>SE, W2 SW (PART MIN RTS)<br>T21S R5W, SEC 35 W2, SE, W2 NE<br>T21S R5W, SEC 36, SW SW, NW SW (1/3 INT)<br>T22S R4W, SEC 8, E2 SW, W2 SE, NE NW, SW NW, N2 NE, E2 SW NE (FEE)<br>SE NW, W2 SW NE (MIN INT)<br>T22S R5W, SEC 2, NW NW, SW SW (FEE), SW NW, NW SW, NE NW, W2 SE (MIN INT)<br>T22S R5W, SEC 3, N W NE, E2 SE<br>T22S R5W, SEC 4, NE NE<br>T22S R5W, SEC 10 N2, SW<br>T22S R5W, SEC 16, ALL<br><br>SHELBY CO. AL<br>T21S R5W, SEC 23 SE SE<br>T21S R5W, SEC 24 NE NW, S2 N2, NW SE, THAT PART OF THE SE SE THAT LIES N & E OF CAHABA RIVER, S2 SW (FEE)<br>NE SE, THAT PART OF THE SE SE THAT LIES S&W OF CAHABA RIVER (MIN RTS)<br>T21S R5W, SEC 25 E2 E2, NW SE, NE SW<br>T21S R5W, SEC 26 THAT PART OF E2 NE LYING E OF SHADES CREEK (FEE)<br>THAT PART OF E2 NE LYING W OF SHADES CREEK (MIN RTS)<br>T21S R5W, SEC 35 SE NE<br>T22S R4W, SEC 4 NE SE<br>T22S R4W, SEC 9, SW, NW SE (FEE)<br>T22S R4W, SEC 10, W2 NW, NE NW, SW SW |
| 00014-001-002 | WHITEN ELIZABETH E | CDX SEQUOYA LLC | 3/3/2004 | BIBB | AL | 139 | 267 | T22S R4W, SEC 4 NE SE<br>T22S R4W, SEC 9, S2, SE NE<br>T22S R4W, SEC 10, W2 NW, NE NW, SW SW |
| 00014-001-002 | WHITEN ELIZABETH E | CDX SEQUOYA LLC | 3/3/2004 | SHELBY | AL | | | T22S R4W, SEC 4 NE SE<br>T22S R4W, SEC 9, S2, SE NE<br>T22S R4W, SEC 10, W2 NW, NE NW, SW SW |

## Exhibit A - Part 1 - CDX Leases

| Lease | Lessor | Lessee | Lease Date | County | State | Book | Page | Description |
|---|---|---|---|---|---|---|---|---|
| 0001 4 001 -003 | ROBEN DOROTHY | CDX SEQUOYA LLC | 3/3/2004 | SHELBY | AL | | | T22S R4W, SEC 4, NE SE<br>T22S R4W, SEC 9, S2, SE NE |
| 0001 4 001 -003 | ROBEN DOROTHY | CDX SEQUOYA LLC | 3/3/2004 | BIBB | | 139 | 270 | T22S R4W, SEC 10, W2 NW, NE NW, SW SW<br>T22S R4W, SEC 4, NE SE<br>T22S R4W, SEC 9, S2, SE NE<br>T22S R4W, SEC 10, W2 NW, NE NW, SW SW |
| 0001 4 001 -004 | WITTEN JOHN | CDX SEQUOYA LLC | 5/21/2004 | SHELBY | AL | | | T22S R4W, SEC 4, NE SE<br>T22S R4W, SEC 9, S2, SE NE<br>T22S R4W, SEC 10, W2 NW, NE NW, SW SW |
| 0001 4 001 -005 | WITTEN AMY | CDX SEQUOYA LLC | 5/21/2004 | SHELBY | AL | | | T22S R4W, SEC 4, NE SE<br>T22S R4W, SEC 9, S2, SE NE<br>T22S R4W, SEC 10, W2 NW, NE NW, SW SW |
| 0001 4 002 -000 | LITTLE GEM COAL COMPANY | CDX SEQUOYA LLC | 5/26/2004 | SHELBY | AL | | | T22S R3W, SEC 5, E2 NW, SW NW, W2 NE, W2 NE, SW SE, N2 SW, N2 SE<br>T22S R3W, SEC 6, E2 NE, NW NE, E2 NW<br>T22S R3W, SEC 7, NE NE, N2 SE NE<br>T22S R3W, SEC 29, S2 SE, SE SW<br>T21S R3W, SEC 31, E2 SE, SW SE<br>T21S R3W, SEC 32, ALL LESS N2 NW AND 22.81 ACS IN THE SE CORNER |
| 0001 4 004 -000 | EUGENE SUTLEY | CDX SEQUOYA LLC | 4/19/2004 | SHELBY | AL | | | T21S R3W, SEC 11, NE NE, NE SE NE<br>T21S R3W, SEC 12, N2 NW<br>T21S R3W, SEC 13, W2 NW, E2 SW, SW NE<br>T21S R3W, SEC 14, E2 NE<br>T21S R3W, SEC 24, NW NW |
| 0001 4 005 -001 | SOUTHERN ELECTRIC GENERATING COMPANY | CDX GAS LLC; CDX SEQUOYA LLC | 10/1/2004 | SHELBY | AL | | | T22S R4W, SEC 20, N2, SE<br>T22S R3W, SEC 1, SW<br>T22S R3W, SEC 2, SE NE, E2 SE<br>T22S R3W, SEC 6, N2 NW<br>T22S R3W, SEC 11, E2 NW, E2 SE<br>T22S R3W, SEC 12, W2 NW, SW SW<br>T22S R3W, SEC 14, NE NE, SW NE<br>T22S R3W, SEC 1, W2 SW<br>T22S R3W, SEC 2, SE NE, NE NW, S2 NW, NE SE<br>T22S R3W, SEC 12, NE, W2 NW, SW NW<br>T24N R10E, SEC 21, SE NW, 2 ACS IN THE NE CORNER OF SW NW<br>T24N R10E, SEC 3, SE NE, W2 NE, E2 W2, NW NW, SE<br>T24N R11E, SEC 3, SW NE, N2 SE<br>T24N R11E, SEC 6, NE, N2 SE<br>T24N R11E, SEC 8, NE NE, LESS 2.7 ACS IN THE E SIDE THEREOF<br>T24N R11E, SEC 9, NW NW, LESS & EXCEPT 2.6 ACS IN SW CORNER<br>T24N R11E, SEC 11, NE SW, S2 SW, SW SE, N2 SE<br><br>T22S R4W, SEC 5, S2 N2, S2<br>T22S R4W, SEC 5, S2 SE<br>T22S R4W, SEC 8, NW NW, SW SW, E2 SE<br>T22S R4W, SEC 17, NE SW, SE, N2<br>T22S R4W, SEC 18, E2 NE<br>T22S R3W, SEC 29, N2 NE OF FRACTIONAL SECTION<br>T22S R3W, SEC 1, NE, N2 SE, W2 SE, NW<br>T22S R3W, SEC 3, NE, S2 NE, W2 SE, W2<br>T22S R3W, SEC 8, ALL<br>T22S R3W, SEC 9, ALL<br>T22S R3W, SEC 11, NE, W2 NW, SW, W2 SE<br>T22S R3W, SEC 12, N2 NW NE |

Page 5 of 35

Exhibit A - Part 1 - CDX Leases

| Lease | Lessor | Lessee | Lease Date | County | State | Book | Page | Description |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | T22S R3W, SEC 15: ALL |
| | | | | | | | | T22S R3W, SEC 26: ALL FRACTIONAL SECTION |
| | | | | | | | | T22S R3W SEC 27: ALL FRACTIONAL SECTION |
| | | | | | | | | T23N R11E, SEC 2: N2 NE, N2 NW |
| | | | | | | | | T23N R11E, SEC 3: N2 N2 |
| | | | | | | | | T24N R10E, SEC 1: ALL |
| | | | | | | | | T24N R10E, SEC 3: NE NE, S2 NE, SE, W2 |
| | | | | | | | | T24N R10E, SEC 11: ALL |
| | | | | | | | | T24N R10E, SEC 15: N2 NE, SW NE, W2 SE, SE SE, W2 |
| | | | | | | | | T24N R11E, SEC 3: NE NE, W2 NW |
| | | | | | | | | T24N R11E, SEC 5: NW SE |
| | | | | | | | | T24N R11E, SEC 6: N2 SW |
| | | | | | | | | T24N R11E, SEC 7: NE NE, NW SW |
| | | | | | | | | T24N R9E, SEC 1: SE NE, SE, SE2 SW NE, SE2 NE SW |
| | | | | | | | | T24N R9E, SEC 3: SE |
| | | | | | | | | T24N R9E, SEC 4: SE SE, SW SW |
| | | | | | | | | T24N R9E, SEC 10: N2 NE |
| | | | | | | | | T24N R9E, SEC 11: ALL |
| | | | | | | | | T24N R9E, SEC 12: W2 NW, SE NW, NE NW, W2 NE |
| | | | | | | | | T24N R9E, SEC 13: NE NE, S2 NE, NE SE, W2 SE, W2 |
| | | | | | | | | T24N R9E, SEC 14: E2 NW |
| | | | | | | | | T24N R9E, SEC 15: NE, N2 NW, SE NW, E2 SW, SE |
| | | | | | | | | T24N R9E, SEC 23: N2 NW, NE SW, S2 SW, E2 |
| | | | | | | | | T24N R9E, SEC 24: N2 NW, SW NW, NW SW, S2 SW |
| | | | | | | | | T24N R9E, SEC 27: S2 NE, NE SW |
| | | | | | | | | |
| | | | | | | | | T21S R3W, SEC 36: N2 SE, NE SW, NW SW |
| | | | | | | | | |
| | | | | | | | | T21S R4W, SEC 30: SW, N2 NE, NE NW, 10 ACS IN THE CORNER OF NW SE, N2 SW, W2 NW, SW SE |
| | | | | | | | | |
| | | | | | | | | T21S R3W, SEC 18: ALL L/E NE NW, SW NW, NW SW, L/E N2 N2 SW SW |
| | | | | | | | | |
| | | | | | | | | T21S R3W, SEC 5: W2 NE, E2 SW |
| | | | | | | | | T21S R3W, SEC 17: SW NE, S2 NW, SW, NW SE, SE SE, N2 N2 NW NE, N2 NW |
| | | | | | | | | T21S R3W, SEC 19: S2 NE, E2 SW |
| | | | | | | | | T21S R3W, SEC 20: W2 NE, SE NE, W2 SE, SE SE, W2 |
| | | | | | | | | T21S R3W, SEC 30: N2 N2, SE NE, NE SE, SW SW |
| | | | | | | | | T21S R3W, SEC 32: E2 SW, S2 SW, N2 NE |
| | | | | | | | | T21S R3W, SEC 31: NE NW |
| | | | | | | | | T21S R4W, SEC 3: S2 NE NW |
| | | | | | | | | T21S R4W, SEC 6: SW SW |
| | | | | | | | | T21S R4W, SEC 7: N2 NW |
| | | | | | | | | T21S R4W, SEC 8: N2 SE, S2 NE |
| | | | | | | | | T21S R4W, SEC 25: SE DIAGONAL 1/2 OF NE NW, NW DIAGONAL HALF OR E2 SW NW, SE NE SW, E2 NW SW, SE DIAGONAL HALF OF E2 SW NW, SE SW, E2 SW SW, SE NW |
| | | | | | | | | T21S R4W, SEC 13: NE DIAGONAL 1/2 OF SW, NE NE, E2 E2 NW NE, E2 E2 NW NE, W2 E2 NW NE, W2 E2 NW NE, S2 NW |
| | | | | | | | | T21S R4W, SEC 31: SE NW, NE SW, SW SW |
| | | | | | | | | T21S R4W, SEC 35: SE DIAGONAL HALF OF S2 NE, SE DIAGONAL HALF OF SW, SE |

Page 6 of 35

Case 08-37922   Document 654-1   Filed in TXSB on 06/29/09   Page 37 of 97

## Exhibit A - Part 1 - CDX Leases

| Lease | Lessor | Lessee | Lease Date | County | State | Book | Page | Description |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | T21S R4W, SEC 36: NE, NW, NW, S2 NW, S2 EXCEPT 4 ACS IN THE NE CORNER OF SE SE, NE NW |
| | | | | | | | | T21S R5W, SEC 1: SE SE |
| | | | | | | | | T21S R5W, SEC 12: W2 NW, NE, E2 NW, NW NE, SE NW NE, NE NE |
| | | | | | | | | T21S R5W, SEC 24: N2 NE, N2 SW |
| | | | | | | | | T21S R5W, SEC 25: SE NW, SW SW |
| | | | | | | | | T21S R5W, SEC 26: SE SE |
| | | | | | | | | T21S R5W, SEC 35: NE NE |
| | | | | | | | | T21S R5W, SEC 36: NW NW, E2 NE |
| | | | | | | | | T22S R3W, SEC 6: SW NE, W2 NW, W2 E2 SE, W 2SE, SW |
| | | | | | | | | T22S R3W, SEC 7: NW NE, W2, SW SE |
| | | | | | | | | T22S R3W, SEC 18: W2, N2 NE, SW WEST OF OLD MONTEVALLO-TUSCALOOSA DIRT ROAD, A PARCEL OF LAND IN THE SW CORNER OF THE E2 NW MORE FULLY DESCRIBED AS: BEGIN AT SW CORNER OF E2 NW, THENCE NE ABOUT 150 YARDS TO A CERTAIN SPRING, THENCE DOWN SAID SPRING BRAN |
| | | | | | | | | T22S R3W, SEC 19: BEGINNING AT THE SE CORNER OF THE SW SW, SECTION 19, GO N ALONG THE E LINE OF SAID SW SW FOR 362.79 FT, THENCE, RIGHT 55 DEGS 25 MINS FOR 140.88 FT, THENCE, LEFT 23 DEGS 35 MINS FOR 140.10 FT, THENCE, LEFT 15 DEGS 11 MINS FOR 202.83 FT T |
| | | | | | | | | T22S R3W, SEC 30: ALL OF FRACTIONAL SECTION W OF SOUTHERN RR ROW |
| | | | | | | | | T22S R4W, SEC 1: NE, SE, S2 SW, S2 NW, N2 SW, NE NW LESS 9 ACS, N 31 ACS OF NW NW |
| | | | | | | | | T22S R4W, SEC 2: ALL |
| | | | | | | | | T22S R4W, SEC 3: NE SE |
| | | | | | | | | T22S R4W, SEC 4: ALL |
| | | | | | | | | T22S R4W, SEC 9: E2 NW, W2 NE |
| | | | | | | | | T22S R4W, SEC 10: NE, N2 SW, SE NW |
| | | | | | | | | T22S R4W, SEC 11: SE NE, NW NE, E2 SW, NW NW, E2 SW, N2 SE, SE SE, N2 SW SE, NE NE |
| | | | | | | | | T22S R4W, SEC 12: E2 W2, NW NW, NE SW NW, SE NW, S NW SW |
| | | | | | | | | T22S R4W, SEC 13: E2 E2, E2 E2 NW NW, SE, SW NW, SW SW |
| | | | | | | | | T22S R4W, SEC 14: S2 LESS E2 NE SE |
| | | | | | | | | T22S R4W, SEC 15: W2 NE, N2 S2 |
| | | | | | | | | T22S R4W, SEC 16: NE, S2 |
| | | | | | | | | T22S R4W, SEC 21: ALL |
| | | | | | | | | T22S R4W, SEC 22: E2 NW, SE NW, E2 SW |
| | | | | | | | | T22S R4W, SEC 23: ALL |
| | | | | | | | | T22S R4W, SEC 24: ALL |
| | | | | | | | | T22S R4W, SEC 25: ALL FRACTIONAL SECTION |
| | | | | | | | | T22S R4W, SEC 26: ALL FRACTIONAL SECTION |
| | | | | | | | | T22S R4W, SEC 27: FRACTIONAL NE |
| | | | | | | | | T24N R11E, SEC 1: ALL |
| | | | | | | | | T24N R11E, SEC 2: ALL |
| | | | | | | | | T24N R11E, SEC 11: NW, NE |
| | | | | | | | | T24N R11E, SEC 12: N2, S2, N2 SW |
| | | | | | | | | T24N R11E, SEC 13: W2 NE |
| | | | | | | | | T24N R12E, SEC 5: NW SW, THAT PART OF THE NE N2 OF FRACTIONAL SECTION W OF SOUTHERN RR ROW, EXCEPT THAT PART OF THE FOLLOWING TRACT WHICH LIES W OF SAID ROW, COMMENCING AT A CERTAIN SWEET GUM TREE ON THE W BANK OF SIMMONS CREEK, RUN S 86 DEGS W 13.31 CHAINS, |
| | | | | | | | | T24N R12E, SEC 6: W2 W2, E2 SE SE, NW SE, E2 NW, NE SE, FRACTIONAL NE |
| | | | | | | | | T24N R12E, SEC 7: SW SW, N2 NE, SW NE, S2 NW, NW NW |
| | | | | | | | | T24N R12E, SEC 18: NW NW |
| | | | | | | | | T21S R3W, SEC 17: NE, LESS 1 AC NEAR THE NW CORNER FOR CEMETERY, & LESS 1.29 ACS BEING THAT PART OF THE KENDRICK HOLCOMB LOT AS DESCRIBED BY DEED RECORDED IN DB 139, PG 299, & THE SW SE, LESS .50 ACS AS DESCRIBED BY DEED RECORDED IN DB 26 PG 354, IN THE |
| | | | | | | | | T21S R3W, SEC 18: NW SW, NE NW, SW NW, N2 N2 SW SW |

Page 7 of 35

## Exhibit A - Part 1 - CDX Leases

| Lease | Lessee | Lessor | Lease Date | County | State | Book | Page | Description |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | T21S R3W, SEC 19: N2 N2, S2 NW, W2 SW |
| | | | | | | | | T21S R3W, SEC 20: NE NE, SE SE |
| | | | | | | | | T21S R3W, SEC 21: NW NW LYING W OF THE MONTEVALLO-BESSEMER ROAD, LESS LOTS DESCRIBED IN DB 148, PG 178, & DB 163, PG 553, & DB 173, PG 463 & LESS THE CHURCH LOT DESCRIBED AS BEGINNING AT THE INTERSECTION OF THE N LINE OF SECTION 21, T21S, R3W, & THE W BOU |
| | | | | | | | | T21S R3W, SEC 29: S2 NW, N2 SW, SW NE, NW SE |
| | | | | | | | | T21S R3W, SEC 30: S2 N2, N2 NW, NW SW |
| | | | | | | | | T21S R4W, SEC 6: SW NW |
| | | | | | | | | T21S R4W, SEC 13: S2 NE SE |
| | | | | | | | | T21S R4W, SEC 14: E2 SE |
| | | | | | | | | T21S R4W, SEC 24: E2 |
| | | | | | | | | T21S R4W, SEC 25: NE |
| | | | | | | | | T21S R4W, SEC 29: NW NW |
| | | | | | | | | T21S R5W, SEC 2: NE NE |
| | | | | | | | | T22S R4W, SEC 3: ALL LESS SE NW & LESS NE SE |
| | | | | | | | | T22S R4W, SEC 6: W2 NW, NE NE |
| | | | | | | | | T22S R4W, SEC 7: N2, SW |
| | | | | | | | | T22S R4W, SEC 10: SE SW |
| | | | | | | | | T22S R4W, SEC 11: W2 SW, S2 SW SE |
| | | | | | | | | T22S R4W, SEC 14: W2 NW, E2 NW, W2 NE |
| | | | | | | | | T22S R4W, SEC 15: W2 NW, SE NW, S2 SW, S2 SE, E2 NE, NE NW |
| | | | | | | | | T22S R4W, SEC 16: NW |
| | | | | | | | | T21S R04W, SEC 5: N2 N2 |
| | | | | | | | | T22S R04W, SEC 6: ALL |
| | | | | | | | | T22S R04W, SEC 7: N2, SW |
| | | | | | | | | T22S R04W, SEC 8: W2 NW, NE NE |
| | | | | | | | | T22S R03W, SEC 1: SE SE |
| | | | | | | | | T22S R03W, SEC 12: NE NE |
| | | | | | | | | T21S R04W, SEC 15: NW SW, SE SW |
| | | | | | | | | T21S R04W, SEC 16: ALL |
| 000114-005-001 | SOUTHERN ELECTRIC GENERATING COMPANY | CDX GAS LLC; CDX SEQUOIA LLC | 10/1/2004 | 9/88 | AL | 149 | 6.68 | T22S R4W, SEC 20: N2 SE |
| | | | | | | | | T22S R5W, SEC 1: SW |
| | | | | | | | | T22S R5W, SEC 2: SE NE, E2 SE |
| | | | | | | | | T22S R5W, SEC 6: N2 NW |
| | | | | | | | | T22S R5W, SEC 11: E2 NW, E2 SE |
| | | | | | | | | T22S R5W, SEC 12: W2 NW, SW SW |
| | | | | | | | | T22S R5W, SEC 14: NE NE, SW NE |
| | | | | | | | | T22S R5W, SEC 1: W2 SW |
| | | | | | | | | T22S R6W, SEC 2: SE NE, NE NW, S2 NW, NE SE |
| | | | | | | | | T24N R10E, SEC 12: NE, N2 NW, SW NW |
| | | | | | | | | T24N R10E, SEC 21: SE NW, 2 ACS IN THE NE CORNER OF SW NW |
| | | | | | | | | T24N R11E, SEC 2: SE NW, 2 ACS IN THE E SIDE THEREOF |
| | | | | | | | | T24N R11E, SEC 3: SE NE, W2 NW, E2 W2, NW SW, SE |
| | | | | | | | | T24N R11E, SEC 4: NE SW, S2 SE |
| | | | | | | | | T24N R11E, SEC 5: S W, NE SE, S2 SE |
| | | | | | | | | T24N R11E, SEC 6: N2 SE |
| | | | | | | | | T24N R11E, SEC 8: NE NE, LESS 2.7 ACS IN THE SW CORNER |
| | | | | | | | | T24N R11E, SEC 9: NW NW, LESS & EXCEPT 2.6 ACS IN THE SW CORNER |
| | | | | | | | | T22S R4W, SEC 5: S2 N2, S2 |
| | | | | | | | | T22S R4W, SEC 7: S2 SE |
| | | | | | | | | T22S R4W, SEC 8: E NW NW, SW SW, E2 SE |
| | | | | | | | | T22S R4W, SEC 17: NE SW, SE, SE N2 |