**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**07/09/2009**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **CDX Gas, LLC, *et al.* [1]** | § | **CASE NO. 08-37922** |
| | § | |
| | § | **(Chapter 11)** |
| **DEBTORS.** | § | **(Jointly Administered)** |

**ORDER UNDER SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULES 2002, 6004 AND 6006 APPROVING THE SALE OF ASSETS
AND EQUITY INTERESTS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS
AND ENCUMBRANCES AND AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES TO ENERVEST ENERGY INSTITUTIONAL FUND XI-A, L.P. AND
ENERVEST ENERGY INSTITUTIONAL FUND XI-WI, L.P. (Relates to Dkt. No. 504)**

Upon the *Motion for an Order Approving the Sale of Assets and Equity Interests Free and Clear of Liens, Claims and Encumbrances and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to EnerVest Energy Institutional Fund XI-A, L.P. and EnerVest Energy Institutional Fund XI-WI, L.P.* (Dkt. No. 504, the "Sale Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), and in accordance with the *Order Granting Expedited Motion of the Debtors for an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain Assets and Equity Interests of the Estates to EnerVest Energy Institutional Fund XI-A, L.P. and EnerVest Energy Institutional Fund XI-WI, L.P., (B) Scheduling an Auction and Hearing to Consider Approval of the Sale; (C) Approving Notice Relating to the Sale; and (D) Granting*

---

[1] The Debtors are: (1) CD Exploration, LLC, (2) CDX Acquisition Company, LLC, (3) CDX Barnett, LLC, (4) CDX Bishop Creek, LLC, (5) CDX East, LLC, (6) CDX Gas International, LLC, (7) CDX Gas, LLC, (8) CDX Isolate, LLC, (9) CDX Minerals, LLC, (10) CDX North America, LLC, (11) CDX Operating, LLC, (12) CDX Panther, LLC, (13) CDX Plum Creek, JV, (14) CDX Sequoya, LLC, (15) CDX Services, LLC, (16) CDX Shale, LLC, (17) CDX Tapicito, LLC, (18) CMV Joint Venture, (19) Arkoma Gathering, LLC, (20) Cahaba Gathering, LLC, (21) CDX Canada, Co., and (22) CDX Rio, LLC.
[2] Capitalized terms not otherwise defined herein shall have the meaning assigned to them in the Sale Motion.

*Related Relief* (Dkt. No. 568, the "Bidding Procedures Order"); and it appearing that proper and adequate notice of the Sale Motion has been given and that no other or further notice need be given; and a hearing on the Sale Motion having been held before this Court on June 30, 2009 (as continued to July 7, 2009, the "Sale Hearing"); and upon the record of the Sale Hearing; and due deliberations having been had; and sufficient cause appearing therefor; it is hereby

**FOUND AND DETERMINED THAT:**

A.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334 and this matter is a core proceeding under 28 U.S.C. §157(b)(2)(A), (N) and (O).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     The statutory predicates for the relief requested in the Sale Motion are section 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C.     Good and sufficient notice of the relief sought in the Sale Motion has been given. No other or further notice of the request for the relief granted herein need be given.

D.     A reasonable opportunity to object or to be heard with respect to the Sale Motion, the Sale Hearing, the sale of the Assets, the assumption and assignment of the Assumed Contracts,[3] and the transactions contemplated therein has been afforded to all interested parties in accordance with the Bankruptcy Rules and Local Rules, and with the notice procedures required by the Bidding Procedures Order, including upon (i) substantially all potential purchasers previously identified or solicited by Debtors during their prepetition sale efforts and any additional parties who have previously expressed an interest in potentially acquiring the Assets at

---

[3] The Debtors have filed a notice of withdrawal of the Sale Motion solely with respect to the proposed assumption and assignment of that certain executory contract (the "Exterran Contract") with Exterran Energy Solutions, L.P. f/k/a Hanover Compression Limited Partnership and Universal Compression, Inc. (Dkt. No. 795, the "Notice of Withdrawal").  Accordingly, the Exterran Contract does not constitute an Assumed Contract for purposes of the Sale Motion or this Order.

any time; (ii) all other potentially interested parties identified by Debtors in their business judgment as a potential purchaser; (iii) the Office of the United States Trustee; (iv) counsel for the Proposed Purchaser; (v) counsel for (a) Bank of Montreal in its capacity as administrative agent under that certain First Lien Credit Agreement dated March 31, 2006, by and among CDX Acquisition Company, LLC and CDX Gas, LLC, as borrowers, and various financial institutions from time to time thereto (the "First Lien Agent") and (b) Credit Suisse in its capacity as administrative agent under that certain Second Lien Credit Agreement dated as of March 31, 2006, by and among, CDX Acquisition Company, LLC and CDX Gas, LLC, as borrowers, and various financial institutions from time to time a party thereto (the "Second Lien Agent," and collectively with the First Lien Agent, the "Agents"); (vi) all parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Assets; (vii) any applicable federal, state and local regulatory or taxing authority, recording office or any governmental entity which has a reasonably known interest in the relief requested in the Sale Motion; (viii) all parties on the most current master service list filed in the Cases; and (ix) all counterparties to executory contracts and unexpired leases identified in the APA for assumption and assignment (the "Assumption Notice Parties"). Such notice constitutes appropriate and adequate notice to all parties and is in compliance with Bankruptcy Rules 2002, 6004, 6006 and 9014. No other or further notice of the Sale Motion, the Sale Hearing, the sale of the Assets, the assumption and assignment of the Assumed Contracts, and the transactions contemplated is necessary or required.

E.      The Debtors have ᴧmarketed the Assets diligently, in good faith and in a *represented that they* commercially reasonable manner to secure the highest and best offer or offers therefor.   A

Case 08-37922    Document 805    Filed in TXSB on 07/07/09    Page 4 of 19

reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the Assets.

F.    The Proposed Purchaser has been identified as the Prevailing Bidder for the Assets.

G.    The Bidding Procedures afforded a full, fair and reasonable opportunity for any entity to make a higher and better offer to purchase the Assets and no higher or better offer than that of the Proposed Purchaser (as defined below) has been made.

H.    The Debtors and Proposed Purchaser have/complied *represented they have* with the Bidding Procedures Order in all respects.

I.    The Debtors are the lawful owners of the Assets.

J.    The purchase price of $29,321,380 (the "Purchase Price") for the Assets is fair and reasonable, and constitutes fair consideration and reasonably equivalent value under the Bankruptcy Code,/the Uniform Fraudulent Conveyance Act, *and has been represented by Debtors as such under* the Uniform Fraudulent Transfer Act, and all other applicable laws of the United States, any state, territory, possession, or the District of Columbia.  Approval of the APA (as amended) by and among Gas, Shale, Barnett, CD Exploration, LLC, and CDX Isolate, LLC (collectively, the "Sellers"), and EnerVest Energy Institutional Fund XI-A, L.P. and EnerVest Energy Institutional Fund XI-WI, L.P. (collectively, the "Proposed Purchaser"), the sale of the Assets and the assumption and assignment of the Assumed Contracts, in accordance with the APA, are in the best interests of the Debtors, their respective creditors and estates, and other parties in interest.   A valid and sound business purposes exists for approval of the transactions contemplated by the Sale Motion pursuant to Bankruptcy Code § 363(b)./the terms of the APA were negotiated at arms-length, in good faith, *Debtors represented that it* and are fair and reasonable.

K.      The APA contemplates that the sale of the Assets shall be free and clear of all

liens, claims and encumbrances except for the Permitted Encumbrances (as defined in the APA)

and as otherwise provided in the APA.

L.      In accordance with the APA, the Debtors are authorized and directed to sell and

transfer the Assets free and clear of all liens, claims and encumbrances because, as required by

Bankruptcy Code § 363(f): (a) applicable non-bankruptcy law permits the sale; (b) the party

holding such lien or other encumbrance has consented to the sale; (c) the interest is a lien and the

Purchase Price is greater than the aggregate value of all liens on the Assets; (d) any lien or

interest is in bona fide dispute; or (e) all parties asserting a lien on the Assets could be compelled

to accept a money satisfaction of such liens in a legal or equitable proceeding pertaining thereto.

M.      *Debtors represented that:* (1)The APA, including all documents ancillary thereto, was negotiated, proposed

and entered into by the parties in good faith, from arm's-length bargaining positions and without

collusion; (2)The Proposed Purchaser was not an "insider" or "affiliate" of the Debtors (as each

such term is defined in the Bankruptcy Code); (3)Neither the Debtors nor the Proposed Purchaser

have engaged in any conduct that would prevent the application of Bankruptcy Code § 363(m) or

cause or permit the application of Bankruptcy Code § 363(n) to the proposed sale and the

transactions contemplated by the APA; and (4) The Proposed Purchaser is a good faith buyer under

Bankruptcy Code § 363(m) and, as such, is entitled to the protections afforded thereby.

N.      The Proposed Purchaser has agreed to assume the Assumed Contracts. The

Assumed Contracts are property of the Debtors' estates pursuant to § 541(a) of the Bankruptcy

Code.

O.      *Debtors represented that* With respect to the Assumed Contracts: (a) there are no defaults under such

Assumed Contracts and, as such, there are no sums due or owing on account of the Assumed

Contracts under Bankruptcy Code §§ 365(b) or 365(f), including, without limitation, no amounts are necessary to cure any defaults or to pay any actual or pecuniary losses, or (b), to the extent there are defaults or sums due or owing on account of the Assumed Contracts, any and all amounts necessary to cure any defaults or to pay any actual or pecuniary losses will be paid (i) by the Debtors for any amount having accrued on or before January 1, 2009 or (ii) by the Proposed Purchaser for any amount having accrued after January 1, 2009.

P.      Upon entry of this Order, (i) Sellers have ~~full corporate power and~~ authority to execute the APA and all other documents contemplated thereby, (ii) Sellers have ~~all~~ the ~~corporate power and~~ authority ~~necessary~~ to consummate the transactions contemplated by the APA, (iii) Debtors have represented that Sellers have taken all corporate action necessary to authorize and approve the APA and the consummation of the transactions contemplated thereby, and (iv) Debtors have represented no consents or approvals, other than those expressly provided for in the APA, are required for Sellers to consummate such transactions.

Q.      The transactions contemplated by the APA will, upon consummation thereof, (i) be a legal, valid and effective transfer of the Assets to the Proposed Purchaser with no further action required on the part of the Debtors or the Sellers and (ii) vest the Proposed Purchaser with good title to the Assets free and clear of all liens, claims and interests, except for the Permitted Encumbrances and as otherwise provided in the APA and this Order. ~~In particular,~~ Debtors represent that the Proposed Purchaser would not have entered into the APA if the sale of the Assets and the assignment of the Assumed Contracts were not free and clear of any claim based on the theory of successor or transferee liability.

R.      Except as otherwise provided in this Order, no consents or approvals, other than this Order and those expressly provided for in the APA, are required for the Sellers to consummate the transactions contemplated by the APA.

S.      Except as otherwise provided in the APA and this Order, consummation of the transactions will not subject the Proposed Purchaser to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtors, any affiliate of the Debtors, or any other person by reason of such transfers and assignments, including, without limitation, based on any theory of antitrust, successor or transferee liability.

T.      To the extent that the Assets constitute all or substantially all of the assets of any of the Debtors, substantial and sufficient exigencies exist that permit the Assets to be sold outside of the context of a plan of reorganization.

U.      Consummation of the APA does not effect a de facto merger of any of the Debtors and the Proposed Purchaser or result in the continuation of any of the Debtors' businesses under the Proposed Purchaser's control. The Proposed Purchaser is not the alter ego of or a successor-in-interest to any of the Debtors, nor is the Proposed Purchaser otherwise liable for any of Debtors' debts and obligations, except to the extent otherwise provided for in the APA.

V.      All findings of fact and conclusions of law made or announced by the Court at the Sale Hearing are incorporated herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The findings of fact entered above and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent that any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed.

2.      The Sale Motion is hereby **GRANTED** in its entirety.

3.      All parties in interest have had the opportunity to object to the relief requested in the Sale Motion and all objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, including all reservations of rights included therein which are not otherwise provided for by this Order are overruled on the merits and in their entirety. The parties who did not object, or who withdrew their objections, to the Sale Motion are deemed to have consented pursuant to § 363(f)(2) of the Bankruptcy Code.

4.      The terms and conditions of the APA are hereby approved in their entirety and are binding upon the parties thereto.  Upon entry of this Order, the covenants contained in the APA, to the extent (if any) not already enforceable by their terms, shall be fully enforceable by the parties to the APA in accordance with and subject to the terms and conditions of the APA, effective retroactive to the execution date of the APA.

5.      The sale of the Assets to the Proposed Purchaser pursuant to the APA is hereby authorized and approved under Bankruptcy Code §§ 105(a) and 363(b) and (f) and the entry of the Sellers into the APA in substantially the form attached hereto as **Exhibit "A"** is hereby approved.

6.    The Sellers are authorized and directed to execute and deliver, and ~~empowered~~ to perform fully under, consummate and implement, the APA in substantially the form attached hereto as **Exhibit "A"**, together with all additional instruments and documents that may be reasonably necessary or desirable to implement such agreements, and to take all further actions as may be reasonably requested by the Proposed Purchaser for the purpose of assigning, transferring, and conferring to the Proposed Purchaser, or reducing to possession, any or all of the Assets, or as may be necessary or appropriate to the performance of the obligations of the Sellers under the APA, including effectuating non-material amendments to the APA in furtherance thereof.

7.    Pursuant to Bankruptcy Code §§ 105(a), 363(b) and 363(f), of the Bankruptcy Code, the Assets shall be transferred to the Proposed Purchaser, in accordance with and to the extent provided in the APA, free and clear of all mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens (including, without limitation, mechanics', materialmens' and other consensual and non-consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal, offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any Court or foreign or domestic governmental entity, or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, of any of the Debtors or their predecessors or affiliates, claims (as that term is defined in the Bankruptcy Code), reclamation claims, obligations, liabilities, demands, guaranties, options,

rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability, except for the Permitted Encumbrances and as otherwise set forth in the APA and this Order, with all the same released, terminated and discharged as to the Assets, but with all of the same, to the extent not paid in full at closing, attaching to the proceeds of the sale of the Assets, in the order of their priority, with the same validity, force and effect which they now have as against the Assets. If the proposed sale fails to close for any reason, then all of such liens, claims, interests, obligations, demands, guarantees, options, rights, contractual commitments, encumbrances and restrictions, shall continue against the Assets unaffected by this Order.

8.    Except as expressly provided in the APA, all persons or entities holding liens, claims and interests in, to, or against the Assets shall be, and they hereby are, forever barred and estopped from asserting such liens, claims and interests against the Proposed Purchaser, its successors and assigns, the Debtors, or the Assets.

9.    All Assumed Contracts subject to the Sale Motion are in full force and effect and have not been terminated by operation of law, their own terms or otherwise.

10.   Pursuant to the Notice of Withdrawal, the Exterran Contract does not constitute an Assumed Contract for purposes of the Sale Motion or this Order.

Dallas 1553001v.8

11.     Subject to the notice procedures required with regard to the Assumed Contracts, the Assumed Contracts are assumed as of the closing of the sale pursuant to Bankruptcy Code § 365 and assigned to the Proposed Purchaser, notwithstanding any provision in any such Assumed Contract (including those of the type described in §§ 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.   Any provision in any Assumed Contract that prohibits or conditions the assignment of such Assumed Contract or allows the party to such Assumed Contract to terminate, recapture, impose any penalty, condition, renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract, constitutes an unenforceable anti-assignment provision which is void and of no force or effect.   Accordingly, (a) the Assumed Contracts may be assumed by the Sellers and assigned to the Proposed Purchaser on the Closing Date (as defined in the APA); (b) the applicable cure amount shall be fixed at the amount set forth on **Exhibit "B"** attached hereto, notwithstanding anything to the contrary in any Assumed Contract or any other document; and (c) each Assumption Notice Party is hereby (i) deemed to have waived and released any right to assert an objection to the proposed assumption and assignment of the Assumed Contract and/or the cure amount with respect thereto, and to have otherwise consented to the assumption and assignment of the applicable Assumed Contract, and (ii) upon the payment of the applicable cure amount, if any, forever barred, permanently enjoined and estopped from asserting or claiming any other or further claims against the Sellers, their estates, the Proposed Purchaser, their respective successors and assigns, the Assets, or the property or assets of any or all such parties, with respect to such Assumed Contract or on grounds that any additional amounts are due or defaults exist, or conditions to assignment must be satisfied, under such Assumed Contract, except for revenues and expenses accrued in the normal course of business

after the Effective Time (as defined in the APA) and prior to the Closing Date which remain unpaid as of the Closing Date and will be paid in the normal course of business after the Closing Date or claims or defaults occurring wholly after the Closing Date.

12.   There shall be no assignment fees, fee increases or any other fees charged to the Proposed Purchaser, the Debtors or the Debtors' estates as a result of the assumption and assignment of the Assumed Contracts.  The Assumed Contracts, upon assignment to Proposed Purchaser, shall be deemed valid and binding, in full force and effect in accordance with their terms.

13.   To the extent there are no payments necessary under Bankruptcy Code §§ 365(b)(1) or 365(f)(2), the Sellers have satisfied the requirements of Bankruptcy Code §§ 365(b)(1) and Bankruptcy Code § 365(f)(2).  Alternatively, to the extent there are defaults or sums due or owing on account of the Assumed Contracts, any and all amounts necessary to cure any defaults or to pay any actual or pecuniary losses will be paid either (i) by the Debtors for any amount having accrued on or before January 1, 2009 or (ii) by the Proposed Purchaser for any amount having accrued after January 1, 2009 at the closing of the sale or as directed by a further order of this Court which, prior to the closing of the sale, has become a final order and which was consented to by the Proposed Purchaser.

14.   The Proposed Purchaser has provided adequate assurance of its future performance under the Assumed Contracts being assigned to it within the meaning of Bankruptcy Code §§ 365(b)(1)(C) and (f)(2)(B).

15.   Each non-Debtor party to an Assumed Contract is hereby forever barred and estopped from (i) asserting against the Debtors or the Proposed Purchaser, their respective affiliates, successors, and assigns, or the property of any of them, any default arising prior to or

existing as of the Closing Date or, as against the Proposed Purchaser, any claim (including any counterclaim, defense, setoff or any other obligation) asserted or assertable against the Debtors as of the Closing Date except for revenues and expenses accrued in the normal course of business after the Effective Time but before the Closing Date and which remain unpaid as of the Closing Date and will be paid in the normal course of business after the Closing Date; and (ii) imposing or charging against the Proposed Purchaser or any of its affiliates any assignment fees, fee increases or any other fees as a result of the Sellers' assumption and assignment to the Proposed Purchaser of the Assumed Contracts.   The validity and enforceability of such assumption and assignment of the Assumed Contracts shall not be affected by any dispute between Debtors and any non-Debtor party to an Assumed Contract.

16.     The failure of the Debtors or the Proposed Purchaser to enforce any term or condition of any Assumed Contract shall not constitute a waiver of such term or condition of the Debtors' or the Proposed Purchaser's rights to enforce every term and condition of the Assumed Contracts.

17.     The Proposed Purchaser is not a successor to the Sellers or their respective estates by reason of any theory of law or equity and the Proposed Purchaser shall not assume any liability or obligation of the Sellers, fixed or contingent, disclosed or undisclosed, or any liability for any liens, causes of action, claims (including, without limitation, claims arising or sounding in tort, environmental claims and claims of taxing authorities all to the fullest extent allowed by applicable law), pending or threatened litigation, security interests, warranties, and interests of any kind, known or unknown, liquidated or unliquidated, whether now existing or arising in the future, debts of any kind or nature, all of which, if any, are retained by Sellers, except as otherwise expressly provided in the APA and this Order.

Dallas 1553001v.8

18.     Except as expressly permitted or otherwise specifically provided by the APA or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, holding interests of any kind or nature whatsoever against or in the Sellers or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Sellers, the Assets, the ownership or operation of the Assets prior to the closing of the sale, or the sale of the Assets are forever barred, estopped, and permanently enjoined from asserting against Proposed Purchaser, its successors or assigns, its property, or the Assets, such persons' or entities' interests.

19.     The transfer of the Assets to the Proposed Purchaser and the related transactions to be consummated in accordance with the APA constitute a good faith transaction entitled to the protections afforded by section 363(m) of the Bankruptcy Code in the event of a reversal or modification on appeal of any or all of the provisions of this Order.

20.     The consideration provided by Proposed Purchaser for the Assets under the APA (a) shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, *and has been represented by Debtors as such under the* Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and all other applicable the laws of the United States, any state, territory, possession or the District of Columbia, and (b) is fair and reasonable, and the sale of the Assets and the related transactions may not be avoided under section 363(n) of the Bankruptcy Code.

21.     Subject to the terms and provisions of that certain *Second Amended Final Order (I) Authorizing the Debtors' Use of Cash Collateral of (A) the First Lien Agent, for and on behalf of the Prepetition First Lien Secured Parties and (B) the Second Lien Agent, for and on behalf of*

*the Prepetition Second Lien Lenders Pursuant to 11 U.S.C. §§ 105, 361 and 363(c) and (II)*
*Granting Adequate Protection Pursuant to 11 U.S.C. § 361* (Dkt. No. 723), the Debtors are
hereby authorized to direct payment of the net proceeds received from the sale of the Assets to
the First Lien Agent.

22.     Until these Cases are closed or dismissed, this Court retains exclusive jurisdiction: *or concurrent*
(i) to enforce and implement the terms and provisions of the APA, all amendments thereto, any
waivers and consents thereunder, and of each of the agreements executed in connection
therewith; (ii) to compel delivery of the Assets to the Proposed Purchaser; (iii) to resolve any
disputes arising under or related to the APA and related agreements, except as otherwise
provided therein; (iv) to enjoin the assertion of any claims, liens, interests or encumbrances
against the Proposed Purchaser or the Assets, and (v) to interpret, implement and enforce the
provisions of this Order.

23.     The APA and any related agreements, documents or other instruments may be
modified, amended or supplemented by the parties thereto in accordance with the terms thereof
without further order of the Court, provided that any such modification, amendment or
supplement is not material and notice of such be contemporaneously provided to the Agents.

24.     Notwithstanding Bankruptcy Rule 6004(g), and as provided by Bankruptcy Rule
7062, this Order shall be effective and enforceable immediately upon entry.

25.     Except with respect to enforcing the terms of the APA and/or this Order, absent a
stay pending appeal, no person shall take any action to prevent, enjoin or otherwise interfere with
consummation of the transactions contemplated in or by the APA or this Order or with the
Proposed Purchaser's title to or use and enjoyment of the Assets.

Dallas 1553001v.8

26.     The Debtors or the Proposed Purchaser and any agent or representative of either of them, are each hereby authorized and empowered to serve upon all filing and recording officers a notice when filing or recording any instruments of transfer (including, without limitation, licenses, deeds, leases, and assignments, modifications and terminations of leases) in accordance with this Order and the APA to evidence and implement this paragraph of this Order. All filing and recording officers are hereby directed to accept, file and record all instruments of transfer including, without limitation, deeds, leases, and assignments, modifications and terminations of leases (if any) to be filed and recorded pursuant to and in accordance with this Order or the APA and the various documents related thereto, without the payment of any such taxes. The Court retains jurisdiction to enforce this direction. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system maintained by any recording officer of any federal, state, and local governmental agency or department.

27.     Each and every federal, state, and local governmental agency or department shall be, and hereby is, directed to accept any and all documents and instruments necessary and appropriate to consummate the transaction contemplated by the APA, including, without limitation, documents and instruments for recording in any governmental agency or department required to transfer to the Proposed Purchaser the names and any and all other licenses or permits under the Sellers' ownership necessary for the operations that are associated with the Assets.

28.     Except as otherwise expressly provided in the APA, Proposed Purchaser shall have no obligation to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment with respect to employees or former employees of the Debtors. Except as otherwise expressly provided in the APA, Proposed Purchaser shall have no liability

with respect to any collective bargaining agreement, employee pension plan, employee welfare or retention, benefit and/or incentive plan to which any Debtor is a party and relating to the Assets (including, without limitation, arising from or related to the rejection or other termination of any such agreement), and, except as expressly provided in the APA, Proposed Purchaser shall in no way be deemed a party to or assignee of any such agreement, and no employee of Proposed Purchaser shall be deemed in any way covered by or a party to any such agreement, and all parties to any such agreement shall not assert against Proposed Purchaser any and all claims arising from or relating to such agreement.  All notices, if any, required to be given to the Debtors' employees prior to closing pursuant to the Workers Adjustment and Retraining Notification Act, or any similar federal or state law, shall be the sole responsibility and obligation of the Sellers, and Proposed Purchaser shall have no duties, responsibility, or liability therefor.

29.     The recitation, in the immediately preceding paragraph of this Order, of specific agreement, plans or statutes is not intended, and shall not be construed, to limit the generality of the categories of liabilities, debts, commitment or obligations referred to therein.

30.     The terms and provisions of the APA and this Order shall be binding in all respects upon, and shall inure to the benefit of the Proposed Purchaser, Debtors, Debtors' estates, and their successors and assigns, and any party acting in whole or in part by or through the Proposed Purchaser, Debtors, Debtors' estates or their successors or assigns, including any trustee that may be appointed in these Cases or any superseding cases under Chapter 7 of the Bankruptcy Code.  Nothing contained in any chapter 11 plan confirmed in these Cases or the confirmation order confirming any plan shall conflict with or derogate from the provisions of the APA or this Order.

31.     The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order, which may be entered converting Debtors' Chapter 11 Cases to Chapter 7 cases, confirming or consummating any plan(s) of reorganization of Debtors, or dismissing any Debtors' Chapter 11 Cases, and the terms and provisions of this Order shall continue in this or any superseding case under the Bankruptcy Code. The obligations of Debtors under this Order or the APA, as applicable, shall not be discharged by the entry of an order confirming a plan(s) of reorganization in any of the Debtors' Chapter 11 Cases. Any order granting conversion or dismissal or any of the Debtors' Chapter 11 Cases shall specifically provide that this Order shall survive such conversion or dismissal.

32.     The failure to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of the Court and the parties that all of the provisions of the APA be authorized in their entirety, subject, however, to the specific terms of this Order.

33.     Any conflict between the terms and provisions of this Order and the APA shall be resolved in favor of this Order.

34.     All entities who are in possession of some or all of the Assets on the Closing Date are hereby directed to surrender possession of the Assets to Proposed Purchaser on the Closing Date.

35.     To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Assets sold, transferred or conveyed to the Proposed Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the sale.

36.     Subject to the fulfillment of the terms and conditions of the APA, as of the Closing Date, this Order shall be considered and constitute for all purposes a full and complete general assignment, conveyance and transfer of the Assets and/or a bill of sale transferring the Sellers' title and interest in the Assets to the Proposed Purchaser, free and clear of all liens, claims and interests except for the Permitted Encumbrances and as otherwise provided in the APA.

37.     With respect to the assets located in Texas, the Sellers and the Proposed Purchaser shall execute two-signature P-4 forms (Certificate of Compliance and Transport Authority) satisfactory to the Texas Railroad Commission within 10 business days after the Closing Date, with respect to any property or interest acquired by the Proposed Purchaser and on which the Sellers are currently the P-4 operator of record.

38.     The provisions of this Order are nonseverable and mutually dependent.

39.     This Court shall retain exclusive *or concurrent* jurisdiction to determine any claims, disputes or causes of action arising out of or relating to this Order, the APA or any of the transactions contemplated under the APA.

**DATED:** _____JUL 0 9 2009_____, 2009.


HONORABLE LETITIA Z. PAUL,
UNITED STATES BANKRUPTCY JUDGE

*Execution Version*

# ASSET PURCHASE AGREEMENT

### BY AND AMONG

# CDX GAS, LLC

# CDX SHALE, LLC

# CDX BARNETT, LLC

### AS SELLER

### AND

# ENERVEST ENERGY INSTITUTIONAL

# FUND XI-A, L.P.

### AND

# ENERVEST ENERGY INSTITUTIONAL

# FUND XI-WI, L.P.

### as Buyer

# TABLE OF CONTENTS

Page

ARTICLE I      DEFINITIONS ...................................................................................... 1
      Section 1.01      Defined Terms.................................................................................. 1
      Section 1.02      Interpretation ................................................................................. 13
ARTICLE II     ASSETS.............................................................................................. 13
      Section 2.01      Agreement to Sell and Purchase...................................................... 13
      Section 2.02      Assets ............................................................................................. 13
      Section 2.03      Excluded Assets .............................................................................. 15
ARTICLE III    CONSIDERATION............................................................................... 16
      Section 3.01      Purchase Price ................................................................................ 16
      Section 3.02      Deposit. .......................................................................................... 16
      Section 3.03      Holdback ........................................................................................ 17
      Section 3.04      Allocated Values ............................................................................ 17
ARTICLE IV     REPRESENTATIONS AND WARRANTIES ........................................ 18
      Section 4.01      Representations and Warranties of Seller ........................................ 18
      Section 4.02      Representations and Warranties of Buyer........................................ 24
ARTICLE V      CERTAIN COVENANTS...................................................................... 25
      Section 5.01      Access.............................................................................................. 25
      Section 5.02      Confidentiality................................................................................. 26
      Section 5.03      Dispositions of Assets ..................................................................... 26
      Section 5.04      Operations ...................................................................................... 26
      Section 5.05      Commercially Reasonable Efforts; HSR Act....................................27
      Section 5.06      Governmental Bonds and Letters of Credit...................................... 28
      Section 5.07      Certain Obligations At or Prior to Closing...................................... 28
      Section 5.08      Notification of Certain Matters ...................................................... 28
      Section 5.09      Notice of Litigation ........................................................................ 28
      Section 5.10      Post-Closing Consents .................................................................... 28
      Section 5.11      Bankruptcy Pleadings..................................................................... 28
      Section 5.12      Certain Contract Matters ................................................................ 29
      Section 5.13      Lease Matters ................................................................................. 29

3928870v.16

ARTICLE VI    CONDITIONS TO CLOSING ....................................................30
    Section 6.01    Conditions to Seller's Obligations .............................30
    Section 6.02    Conditions to Buyer's Obligations ............................30
    Section 6.03    Conditions to Buyer and Seller's Obligations.......................31
ARTICLE VII    CLOSING ..............................................................32
    Section 7.01    Time and Place of Closing ....................................32
    Section 7.02    Adjustments to Purchase Price at Closing.........................32
    Section 7.03    Actions of Seller at Closing ..................................36
    Section 7.04    Actions of Buyer at Closing ..................................37
ARTICLE VIII    CERTAIN POST-CLOSING OBLIGATIONS ..........................37
    Section 8.01    Operation of the Assets After Closing .........................37
    Section 8.02    Files ........................................................37
    Section 8.03    Further Cooperation ..........................................37
    Section 8.04    Document Retention...........................................37
    Section 8.05    Employee Matters. ...........................................38
ARTICLE IX    TERMINATION .........................................................38
    Section 9.01    Right of Termination..........................................38
    Section 9.02    Effect of Termination.........................................39
    Section 9.03    Seller Remedy Upon Termination ............................39
    Section 9.04    Buyer Remedies Upon Termination..........................39
    Section 9.05    Reimbursement Procedure ...................................41
    Section 9.06    Payment of Break Up Fee ....................................41
    Section 9.07    Automatic Termination .......................................41
ARTICLE X    ASSUMPTION...........................................................41
    Section 10.01    Assumption..................................................41
    Section 10.02    Negligence and Fault.........................................42
    Section 10.03    Release. .....................................................43
    Section 10.04    Survival .....................................................43
    Section 10.05    Non-Compensatory Damages ................................44
    Section 10.06    Arkoma Indemnity ..........................................44
ARTICLE XI    LIMITATIONS ON REPRESENTATIONS AND WARRANTIES...............44
    Section 11.01    Disclaimers of Representations and Warranties.....................44

3928870v.16

ARTICLE XII  MISCELLANEOUS ..................................................................................46

Section 12.01   Tax Matters. ................................................................................46

Section 12.02   Names.........................................................................................48

Section 12.03   Entire Agreement .......................................................................48

Section 12.04   Waiver ........................................................................................48

Section 12.05   Publicity......................................................................................48

Section 12.06   No Third Party Beneficiaries......................................................48

Section 12.07   Assignment..................................................................................48

Section 12.08   Governing Law............................................................................49

Section 12.09   Notices........................................................................................49

Section 12.10   Severability.................................................................................50

Section 12.11   Counterparts ...............................................................................50

Section 12.12   Amendment .................................................................................50

Section 12.13   Schedules and Exhibits................................................................50

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | Part 1 | Leases |
| Exhibit A | Part 2 | Wells/Allocated Value |
| Exhibit A | Part 3 | Easements, Rights-of-Way, Surface Fees and Surface Leases |
| Exhibit A | Part 4 | Field Offices |
| Exhibit A | Part 5 | Material Contracts |
| Exhibit A | Part 6 | Vehicles |
| Exhibit A | Part 7 | Intellectual Property |
| Exhibit B | – | Excluded or Rejected Contracts |
| Exhibit C | – | Form of Assignment |
| Exhibit D | – | Intentionally Omitted |
| Exhibit E | – | Form of Holdback Escrow Agreement |
| Exhibit F | – | Form of Non-Exclusive License |
| Exhibit G | – | Bidding Procedures |

**SCHEDULES**

| | | |
|---|---|---|
| Schedule 1.01A | – | Knowledge (Seller) |
| Schedule 1.01B | – | Knowledge (Buyer) |
| Schedule 1.01C | – | Tax Liens |
| Schedule 4.01(e) | – | Noncontravention |
| Schedule 4.01(f) | – | Governmental Approvals |
| Schedule 4.01(g) | – | Litigation |
| Schedule 4.01(i) | – | Seller Employees |
| Schedule 4.01(j) | – | Taxes |

iv

Schedule 4.01(k)        –        Intellectual Property
Schedule 4.01(l)        –        Royalty Payments
Schedule 4.01(m)       –        Hydrocarbon Sales
Schedule 4.01(n)        –        Environmental Notices
Schedule 4.01(o)        –        Compliance with Laws
Schedule 4.01(q)        –        AFEs
Schedule 4.01(r)        –        Preferential Purchase Rights
Schedule 4.01(s)        –        Imbalances
Schedule 4.01(t)        –        Payout Balances
Schedule 4.01(u)        –        Reserve Report
Schedule 4.01(x)        –        Absence of Changes
Schedule 4.01(z)        –        Credit Support
Schedule 4.01(aa)      –        Confidentiality Restrictions
Schedule 4.01(bb)      –        Insurance
Schedule 4.01(cc)      –        Well Status
Schedule 6.02(d)        –        Required Consents

3928870v.16

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is made and entered into this 15th day of April, 2009, by and among CDX GAS, LLC, a Delaware limited liability company, CDX SHALE, LLC, a Delaware limited liability company, and CDX BARNETT, LLC, a Delaware limited liability company, (individually and collectively, "**Seller**") and ENERVEST ENERGY INSTITUTIONAL FUND XI-A, L.P., a Delaware limited partnership and ENERVEST ENERGY INSTITUTIONAL FUND XI-WI, L.P., a Delaware limited partnership (collectively, "**Buyer**")  Buyer and Seller are sometimes referred to herein, collectively, as the "**Parties**" and, individually, as a "**Party**."

### W I T N E S S E T H:

**WHEREAS,** Seller is the owner of certain oil and gas assets and the Arkoma Membership Interest (as hereinafter defined); and

**WHEREAS,** Seller is willing to sell to Buyer, and Buyer is willing to purchase from Seller, all of such assets, all upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE,** in consideration of the premises and of the mutual promises, representations, warranties, covenants, conditions and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each Party, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.01   <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings set forth below:

"**Accounting Arbitrator**" shall have the meaning given that term in Section 7.02(e).

"**Adjusted Purchase Price**" shall have the meaning given that term in Section 3.01.

"**AFEs**" shall have the meaning given that term in Section 4.01(q).

"**Affiliate**" shall mean any Person that, directly or indirectly, through one or more entities, controls, is controlled by or is under common control with the Person specified.  For the purpose of the immediately preceding sentence, the term "control" and its syntactical variants mean the power, direct or indirect, to direct or cause the direction of the management of such Person, whether through the ownership of voting securities, by contract, agency or otherwise.

"**Agreement**" shall have the meaning given that term in the preamble.

"**Allocation**" shall have the meaning given that term in Section 3.04.

"**Arkoma**" shall mean Arkoma Gathering, LLC, a Delaware limited liability company.

"**Arkoma LLC Agreement**" shall mean the Company Agreement of Arkoma dated December 1, 2001, as the same may have been amended, modified, waived or supplemented.

"**Arkoma Membership Interest**" shall mean Seller's 75% equity interest as a member in Arkoma.

"**Assets**" shall have the meaning given that term in Section 2.02.

"**Assignment**" shall have the meaning given that term in Section 7.03(a).

"**Assumed Obligations**" shall have the meaning given that term in Section 10.01.

"**Assumed Seller Taxes**" shall mean Non-Income Taxes or Production Taxes attributable to Tax period ending prior to the Effective Time that have given rise to a Lien reflected on Schedule 1.01C.

"**Bankruptcy Cases**" shall mean the bankruptcy cases of CDX Gas, LLC and certain of its Affiliates jointly administered under Bankruptcy Case No. 08-37922 currently pending in the Bankruptcy Court.

"**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

"**Bankruptcy Code**" shall mean the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101 through 1532, as may have been or are amended from time to time.

"**Bankruptcy Rules**" shall mean, collectively, (i) the Federal Rules of Bankruptcy Procedure, (ii) the Federal Rules of Civil Procedure, and (iii) the local rules of the Bankruptcy Court, as (i) through (iii) may be applicable to the Bankruptcy Cases and proceedings therein and as (i) through (iii) may have been or are amended from time to time.

"**Bankruptcy Sale Motion**" shall have the meaning given that term in Section 5.11(a).

"**Bidding Procedures**" shall have the meaning set forth in Section 5.11(b).

"**Bidding Procedure Motion**" shall have the meaning given that term in Section 5.11(b).

"**Bidding Procedures Order**" shall have the meaning set forth in Exhibit G to this Agreement.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or a day on which banks in Houston, Texas are authorized or obligated by Law to close.

"**Buyer**" shall have the meaning given that term in the preamble.

"**Buyer Employer**" shall mean Buyer or one of Buyer's Affiliates.

2

"**Buyer Representatives**" shall mean Buyer and its members, partners, shareholders and Affiliates, and the officers, board of directors and/or managers, employees, agents and representatives of all of the foregoing Persons.

"**Closing**" shall have the meaning given that term in Section 7.01.

"**Closing Date**" shall have the meaning given that term in Section 7.01.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Commonly Controlled Entity**" shall have the meaning given that term in Section 4.01(i).

"**Confidentiality Agreement**" shall mean that certain Confidentiality Agreement between EnerVest, Ltd. and CDX Gas, LLC, dated as of July 30, 2008.

"**Confirmation Order**" shall have the meaning given that term in the Rio Subscription Agreement.

"**Continuing Employee**" shall have the meaning given that term in Section 8.05(a).

"**Contracts**" shall have the meaning given that term in Section 2.02(g).

"**Credit Support**" shall have the meaning given that term in Section 4.01(z).

"**Debt Facilities**" shall mean the following, together with all amendments, forbearances and other modifications thereto:

      (a)     the First Lien Credit Agreement;

      (b)     that certain Second Lien Credit Agreement dated as of March 31, 2006 among CDX Acquisition Company, LLC, as the parent of CDX Gas, LLC, CDX Gas, LLC (f/n/a CDX Funding, LLC), as borrower, the institutions from time to time party thereto as agents and lenders, and Credit Suisse, as administrative agent, together with all collateral or security documents executed in connection therewith by CDX Gas, LLC or its Affiliates; and

      (c)     that certain Senior Subordinated Unsecured Term Loan Credit Agreement dated as of March 31, 2006 among CDX Gas, LLC, as borrower, the institutions party thereto as lenders, and Wells Fargo N.A., as administrative agent.

"**Defensible Title**" shall mean such title of one or more of the Parties constituting Seller that, subject to and except for the Permitted Encumbrances:

      (a)     with respect to any Subject Well (but limited to any currently producing intervals and, with respect to any Future Well, if set forth in Exhibit A—Part 2, the specified formation or reservoir set forth in such Exhibit or in Exhibit A—Part 1):

3

(i)    entitles Seller to receive not less than the percentage set forth in Exhibit A—Part 2, as the net revenue interest for such Subject Well of all Hydrocarbons produced, saved and marketed from such Subject Well, without reduction of such interest throughout the duration of the life of such Subject Well, except (A) as set forth in Exhibit A—Part 2, (B) decreases in connection with those operations in which Seller may from and after the date of this Agreement be a non-consenting co-owner, (C) decreases resulting from the establishment or amendment of pools or units from and after the date of this Agreement, and (D) decreases required to allow other working interest owners to make up past underproduction or pipelines to make up past under deliveries;

(ii)    obligates Seller to bear the percentage of the costs and expenses relating to the maintenance, development and operation of such Subject Well not greater than the working interest for such Subject Well (shown in Exhibit A—Part 2), without increase throughout the duration of the life of such Subject Well, except (A) as set forth in Exhibit A—Part 2, (B) increases resulting from contribution requirements with respect to defaulting co-owners under applicable operating agreements, and (C) increases to the extent that they are accompanied by a proportionate increase in Seller's corresponding net revenue interest (set forth in Exhibit A—Part 2); and

(b)    is free and clear of all Liens.

"**Delinquent ORRIs**" shall have the meaning given that term in Section 7.02(b).

"**Delinquent Cure Amounts**" shall have the meaning given that term in Section 7.02(b).

"**Deposit**" shall have the meaning given that term in Section 3.02(a).

"**Deposit Escrow Agreement**" shall mean the escrow agreement entered into contemporaneously with this Agreement among Buyer, CDX Gas, LLC and Escrow Agent related to the Deposit and the Rio Deposit.

"**Disbursing Agent**" shall have the meaning given that term in the Rio Subscription Agreement.

"**Dispute Notice**" shall have the meaning given that term in Section 7.02(d).

"**DOJ**" shall mean the Department of Justice.

"**Due Diligence Expiration Date**" shall mean May 29, 2009.

"**Effective Time**" shall mean January 1, 2009.

"**Environmental Laws**" shall mean applicable federal and state statutes and regulations and applicable local statutes, regulations and/or ordinances relating to the protection of human health and the environment, including without limitation the Clean Air Act, the Clean Water Act, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Occupational Safety and Health Act of 1970, the Resource Conservation and Recovery Act of 1976, the Safe Drinking Water

4

Act, the Toxic Substances Control Act and the Oil Pollution Act of 1990.   The term **"Environmental Laws"** shall also include all amendments to any of the foregoing that are adopted prior to the date of this Agreement, but shall not include any Law not in effect as of the date of this Agreement.

**"Environmental Reports"** shall have the meaning given that term in Section 5.01.

**"ERISA"** shall have the meaning given that term in Section 4.01(i).

**"Escrow Agent"** shall mean JPMorgan Chase Bank, National Association.

**"Excluded Assets"** shall have the meaning given that term in Section 2.03.

**"Expense Reimbursement"** shall mean all of the actual, documented out of pocket costs and expenses incurred by Buyer in connection with its due diligence review of the Assets and the Rio Assets, drafting and negotiations concerning the LOI, this Agreement and the Rio Subscription Agreement, and Bankruptcy Court hearings related thereto.

**"Expense Reimbursement Cap"** shall have the meaning given that term in Section 9.04(b).

**"Facilities"** shall have the meaning given that term in Section 2.02(c).

**"Files"** shall have the meaning given that term in Section 2.02(i).

**"Final Cash Collateral Order"** shall mean that certain order signed and entered on March 27, 2009, at docket number 418, in Case No. 08-37622, *In re: CDX Gas, LLC, et al.*, United States Bankruptcy Court, Southern District of Texas, Houston Division.

**"Final Order"** shall mean an order of a court of competent jurisdiction which has been entered of record on such court's docket, and the time to appeal or request re-consideration of a new hearing or trial with respect to such order has expired without any such challenge being filed.  No order shall be deemed to be a "Final Order" if performance or execution of such order has been stayed or enjoined.

**"Final Price"** shall have the meaning given that term in Section 7.02(d).

**"Final Settlement Statement"** shall have the meaning given that term in Section 7.02(d).

**"First Lien Credit Agreement"** shall mean that certain First Lien Credit Agreement dated as of March 31, 2006 among CDX Acquisition Company, LLC, as the parent of CDX Gas, LLC, CDX Gas, LLC (f/n/a CDX Funding, LLC), as borrower, the financial institutions from time to time a party thereto as agents and lenders, and Bank of Montreal, as administrative agent, together with all collateral or security documents executed in connection therewith by CDX Gas, LLC or its Affiliates.

**"FTC"** shall mean the Federal Trade Commission.

"**Future Location**" shall mean each location identified on the maps provided to Buyer by Seller for a future completion or for a well to be drilled in the future, subject to any restriction to a formation set forth on such maps or on Exhibit A—Part 2 with respect to such location.

"**Future Well**" shall mean an existing well with behind pipe potential at a Future Location or a well to be drilled in the future at a Future Location, in each case that is identified on Exhibit A – Part 2 as a well other than a well designated as "PDP" on such Exhibit.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as in effect from time to time.

"**Governmental Authority**" shall mean any federal, state, county, municipal or foreign government or any court of competent jurisdiction, regulatory or administrative agency, quasi-governmental body, board, bureau, department, commission or other governmental authority that exercises jurisdiction over any of the Assets.

"**Hedges**" shall mean any agreements for natural gas prices swaps or interest rate swaps (or transaction confirmations related thereto) and any other derivative instruments encumbering or related to the Assets.

"**Holdback**" shall have the meaning given that term in Section 3.03.

"**Holdback Escrow Agreement**" shall mean an escrow agreement to be entered into at Closing, in substantially the form attached hereto as Exhibit E, among Buyer, CDX Gas, LLC and Escrow Agent related to the Holdback.

"**HSR Act**" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended from time to time, and the rules and regulations thereunder.

"**Hydrocarbons**" shall mean oil, gas, casinghead gas, condensate, sulfur, and other liquid or gaseous hydrocarbons, or any of them or any combination thereof, and all products and substances extracted, separated, processed and produced therefrom, including coalbed methane gas and carbon dioxide.

"**Imbalance**" shall mean any (i) imbalance at the wellhead between the amount of Hydrocarbons produced from a Well and taken by Seller and allocated to the Assets and the amount of Hydrocarbons produced from a Well and allocable to Seller's interest therein and (ii) imbalance between the amount of Hydrocarbons delivered by Seller to any pipeline and allocated to the Assets and the amount of Hydrocarbons scheduled to be delivered by Seller with respect to the Assets.

"**Income Taxes**" shall mean Taxes other than Non-Income Taxes, Production Taxes and Transfer Taxes.

"**Intellectual Property**" shall mean (a) all patents, patent applications and invention disclosures worldwide, together with all reissues, continuations, continuations-in-part, divisionals, supplementary protection certificates, extensions and re-examinations thereof; (b) all registered and unregistered trademarks, service marks, trade names, logos, trade dress and

6

3928870v.16

slogans, worldwide, and registrations and applications for registration thereof and any and all goodwill associated therewith; (c) all copyrights in copyrightable works, and all other rights of authorship recognized by statute or otherwise, and all applications, registrations and renewals in connection therewith; (d) all mask works and semiconductor chip rights, and all applications, registrations and renewals in connection therewith; (e) all trade secrets and confidential information, including ideas, research and development, know-how, and marketing plans and proposals, confidential inventions, technical information, processes, drawings, technology, research studies, computer programs, marketing studies, and customer lists; (f) domain names and uniform resource locators, and all contractual rights to the foregoing; (g) all seismic and geotechnical data and rights, to the extent the same is assignable without payments of fees or penalties or other liability; and (h) all other intellectual property rights relating to any or all of the foregoing.

"**Interim Period**" shall mean that period commencing on the date of the execution of this Agreement and terminating upon the earlier of the Closing or the termination of this Agreement.

"**Knowledge**" shall mean, with respect to Seller, the actual knowledge (without investigation) of the Persons listed on Schedule 1.01A hereto and with respect to Buyer, the actual knowledge (without investigation) of the Persons listed on Schedule 1.01B hereto.

"**Law**" shall mean any applicable principle of common law, statute, law, rule, regulation, ordinance, order, code, ruling, writ, injunction, decree or other official act of or by any Governmental Authority.

"**Leases**" shall have the meaning given that term in Section 2.02(a).

"**Liabilities**" shall mean, except as provided in Section 10.05, any and all claims, causes of action, payments, charges, judgments, assessments, liabilities, losses, damages, penalties, fines or costs and expenses, including any attorneys' fees, legal or other expenses incurred in connection therewith and including liabilities, costs, losses and damages for personal injury or death or property damage.

"**Liens**" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, lien (statutory or otherwise), security interest or other charge or encumbrance, any financing lease having substantially the same economic effect as any of the foregoing, any assignment of the right to receive income, any other type of preferential arrangement, or any right-of-way, easement, encroachment or encumbrance of any kind.

"**LOI**" shall mean that certain Letter of Intent among Seller, Rio and Buyer, dated March 17, 2009, as may have been amended from time to time.

"**Material Adverse Effect**" shall mean an event or circumstance that results in a material adverse effect on the use, ownership or operation of the Assets, taken as a whole and as currently operated as of the date of this Agreement, or an occurrence or event that materially hinders or impedes the consummation by Seller of the transactions contemplated by this Agreement; provided, however, that no change, effect, event, occurrence, state of facts or development that arises or results from the following shall constitute a Material Adverse Effect: (a) changes in general economic, capital market, regulatory or political conditions or changes in applicable Law

7

or the interpretation thereof that, in any case, do not disproportionately affect Seller or the Assets in any material respect; (b) changes that affect generally the industry in which Seller is engaged and do not disproportionately affect the Assets in any material respect; (c) the declaration by the United States of a national emergency or acts of war or terrorism or act of God that, in any case, do not disproportionately affect Seller or the Assets in any material respect; (d) the entry into or announcement of the transactions contemplated by this Agreement, or the consummation of the transactions contemplated hereby; (e) changes in GAAP as applied to Seller; (f) any changes in commodity prices, including any commodities relating to the business of Seller; (g) any action or omission of Buyer; or (h) any action or omission of Seller taken in accordance with the terms of this Agreement without the violation thereof or with the prior written consent of Buyer.

"**Material Contract**" shall mean the following (excluding any (x) Contract executed as part of the Debt Facilities and (y) Lease or other instrument creating or transferring title to any Property except to the extent that such Lease or other instrument contains an express obligation to develop the lands covered thereby or other contractual obligation outside the ordinary course of business or not customary in the oil and gas industry):

     (a)     any Contract that (i) can reasonably be expected to result in aggregate payments by Seller with respect to the Assets of more than $300,000 during the current or any subsequent fiscal year (based solely on the terms thereof and without regard to any expected increase in volumes or revenues) and (ii) cannot be terminated without penalty on 60 days or less notice;

     (b)     any Contract that can reasonably be expected to result in aggregate revenues to Seller with respect to the Assets of more than $300,000 during the current or any subsequent fiscal year (based solely on the terms thereof and without regard to any expected increase in volumes or revenues);

     (c)     any purchase and sale, transportation, processing, refining or similar Contract (in each case) relating to the Assets to which Seller is a party that is not terminable without penalty on 60 days or less notice;

     (d)     any indenture, mortgage, loan, note, credit, sale-leaseback or similar Contract (in each case) to which any of the Assets are subject and all related security agreements or similar agreements associated therewith; and

     (e)     any Contract between an Affiliate of CDX Gas, LLC, on the one hand, and any other Party constituting Seller, on the other hand, that will not be terminated on or prior to Closing and that binds the Assets.

"**Minimum Breach Threshold**" shall mean an amount equal to 4% of the aggregate of the Purchase Price and the Rio Consideration.

"**Non-Exclusive License**" shall mean a non-exclusive license agreement to be entered into at Closing, in substantially the form attached hereto as Exhibit F, between Buyer and CDX Gas LLC, related to certain Intellectual Property (as defined herein and under the Rio Subscription Agreement).

3928870v.16

"**Non-Income Taxes**" shall mean ad valorem, property, excise and similar Taxes and shall exclude Production Taxes, Transfer Taxes and Taxes based upon, measured by, or calculated with respect to (i) net income, profits or similar measures or (ii) multiple bases (including corporate franchise, business and occupation, business license or similar Taxes) if one or more of the bases on which such Tax is based, measured or calculated is described in clause (i), in each case together with any interest, penalties, or additions to such Tax.

"**Organizational Documents**" shall mean the articles of incorporation, certificate of incorporation, certificate of formation, bylaws, operating agreement, certificate of limited partnership, partnership agreement and all other similar documents, instruments or certificates executed, adopted or filed in connection with the creation, formation or organization of a Person, including any amendments thereto.

"**Other Parties**" shall have the meaning given that term in Section 4.01(p).

"**Parties**" shall have the meaning given that term in the preamble.

"**Permitted Encumbrances**" shall mean any of the following:

(a)     the terms, conditions, restrictions, exceptions, reservations, limitations and other matters contained in any Material Contract or any recorded agreements, instruments and documents that create or reserve to Seller its interests in any of the Assets, including the Leases and assignments thereof, to the extent that such agreements, instruments and documents do not operate to reduce any net revenue interest of Seller (as set forth in Exhibit A—Part 2), increase any working interest of Seller (as set forth in Exhibit A— Part 2) without a proportionate increase in the corresponding net revenue interest of Seller or otherwise, individually or in the aggregate, materially impair the use of the Assets to which they relate as currently used;

(b)     any (i) undetermined or inchoate liens or charges constituting or securing the payment of expenses that were incurred incidental to maintenance, development, production or operation of the Assets or for the purpose of developing, producing or processing Hydrocarbons therefrom or therein, and (ii) materialman's, mechanic's, repairman's, vendor's, construction, employee's, contractor's, operator's or other similar liens or charges for the payment of expenses, in the case of each of (i) or (ii), arising in the ordinary course of business that are not yet delinquent;

(c)     any Liens for Taxes or assessments not yet delinquent or that are scheduled on Schedule 1.01C;

(d)     any Liens in the ordinary course of business created by Law, reserved in oil and gas leases for royalties, bonuses or rentals or created to secure compliance with the terms of the agreements, instruments and documents that create or reserve to Seller its interests in the Assets or govern the operation thereof, that, in each case, (i) do not, individually or in the aggregate, materially impair the use of the Assets to which they relate as currently used, and (ii) if they constitute security for any obligations, such obligations are not yet delinquent or Seller is not in default thereof;

9

(e)     any obligations or duties affecting the Assets to any Governmental Authority with respect to any franchise, grant, license or permit and all applicable Laws;

(f)     any easements, rights-of-way, servitudes, licenses, permits and other similar rights for the purposes of pipelines, transmission lines, Facilities or other similar fixtures or personalty that do not, individually or in the aggregate, materially impair the use of the Assets to which they relate as currently used;

(g)     all lessors' royalties, overriding royalties, net profits interests, carried interests, production payments, reversionary interests and other burdens on, or deductions from the proceeds of production, that do not operate to reduce any net revenue interest of Seller (as set forth in Exhibit A—Part 2) or increase any working interest of Seller (as set forth in Exhibit A—Part 2) without a proportionate increase in the corresponding net revenue interest of Seller, and any other matters set forth on Exhibit A—Part 2;

(h)     preferential rights to purchase or similar agreements, and Third Party consents to assignments or similar agreements;

(i)     conventional rights of reassignment;

(j)     such Title Defects as Buyer may have waived after the date hereof;

(k)     Liens arising in the ordinary course of business and other restrictions under all Contracts, including all production sales contracts; division orders; contracts for sale, purchase, exchange, refining or processing of Hydrocarbons; unitization and pooling designations, declarations, orders and agreements; operating agreements; farmout agreements; agreements of development; area of mutual interest agreements; gas balancing or deferred production agreements; processing agreements; plant agreements; pipeline, gathering and transportation agreements; injection, repressuring and recycling agreements; carbon dioxide purchase or sale agreements; salt water or other disposal agreements; seismic or geophysical permits or agreements; and any and all other agreements that, in each case, (i) do not operate to reduce any net revenue interest of Seller (as set forth in Exhibit A—Part 2), increase any working interest of Seller (as set forth in Exhibit A—Part 2) without a proportionate increase in the corresponding net revenue interest of Seller, (ii) do not, individually or in the aggregate, materially impair the use of the Assets to which they relate as currently used, and (iii) if they constitute security for any obligations, such obligations are not yet delinquent; and

(l)     any Liens that will be released on or before the Closing.

"**Person**" shall mean an individual, corporation, partnership, association, trust, limited liability company or any other entity or organization, including government or political subdivisions or an agency, unit or instrumentality thereof.

"**Production Taxes**" shall mean severance, production and similar Taxes based upon or measured by the production of Hydrocarbons.

"**Properties**" shall have the meaning given that term in Section 2.02(b).

10

"**Purchase Price**" shall have the meaning given that term in Section 3.01.

"**Rio**" shall mean CDX Rio, LLC.

"**Rio Allocation**" shall mean "Allocation" as such term is defined in the Rio Subscription Agreement.

"**Rio Assets**" shall mean the "Assets" as such term is defined in the Rio Subscription Agreement.

"**Rio Consideration**" shall have the meaning given such term in the Rio Subscription Agreement.

"**Rio Deposit**" shall mean the "Deposit" as such term is defined in the Rio Subscription Agreement.

"**Rio Membership Interest**" shall mean "Membership Interest" as such term is defined in the Rio Subscription Agreement.

"**Rio Subscription Agreement**" shall mean that certain Subscription Agreement of even date herewith among Buyer and Rio.

"**Sale Hearing**" shall have the meaning given that term in Section 5.11(b).

"**Sale Order**" shall mean an order of the Bankruptcy Court granting the Bankruptcy Sale Motion.

"**Second Lien Agent**" shall have the meaning given that term in the Final Cash Collateral Order.

"**Second Lien Lenders**" shall have the meaning given that term in the Final Cash Collateral Order.

"**Seller**" shall have the meaning given that term in the preamble.

"**Seller Employee**" shall have the meaning given that term in Section 4.01(i).

"**Seller Representatives**" shall mean Seller and its members, partners, shareholders, Affiliates, successors and assigns, and the officers, board of directors and/or managers, employees, agents, and representatives of all of the foregoing Persons.

"**Straddle Period**" shall mean any Tax period beginning before and ending after the Effective Time.

"**Subject Well**" shall mean a Well or a Future Well, as the context requires.

"**Taxes**" shall mean (a) any taxes, assessments and other governmental charges imposed by any Taxing Authority, including net income, gross income, profits, gross receipts, license, employment, stamp, occupation, premium, alternative or add-on minimum, ad valorem, real

11

property, personal property, transfer, real property transfer, value added, sales, use, environmental (including taxes under Code Section 59A), customs, duties, capital stock, franchise, excise, withholding, social security (or similar), unemployment, disability, payroll, fuel, excess profits, windfall profit, severance, estimated or other tax, including any interest, penalty or addition thereto, whether disputed or not, and any expenses incurred in connection with the determination, settlement or litigation of the Tax liability (b) any obligations under any agreements or arrangements with respect to Taxes described in clause (a) above, and (c) any transferee liability in respect of Taxes described in clauses (a) and (b) above or payable by reason of assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law) or otherwise.

"**Taxing Authority**" shall mean, with respect to any Tax, a Governmental Authority that imposes such Tax, and the agency (if any) charged with the collection of such Tax for such entity, including, without limitation, any Governmental Authority that imposes, or is charged with collecting, Social Security or similar charges or premiums.

"**Tax Proceeding**" shall have the meaning set forth in Section 12.01(b).

"**Tax Returns**" shall mean any report, return, information statement, schedule, attachment, payee statement or other information required to be provided to any Taxing Authority with respect to Taxes or any amendment thereof, including any return of an affiliated, combined or unitary group, and any and all work papers relating to any Tax Return.

"**Third Party**" shall mean any Person other than a Party to this Agreement or an Affiliate of a Party to this Agreement.

"**Title Defect**" shall mean any failure of Seller (as a collective group) to have Defensible Title to any Property. Notwithstanding the foregoing, none of the following shall constitute a Title Defect: (a) the loss of or reduction of interest in any Subject Well or other Property following the date hereof due to: (i) any election or decision made by a Seller in accordance with applicable joint operating agreements as permitted under this Agreement or (ii) the expiration of the primary or secondary term of any Lease, (b) in the case of a Future Well, any permits, easements, rights-of-way, unit designations, or production and drilling units not yet obtained, formed or created; (c) defects based solely on (i) lack of information in Seller's or its Affiliates' files but that is otherwise available to Buyer with commercially reasonable efforts, or (ii) references to a document(s) if such document(s) is not in Seller's or its Affiliates' files but is otherwise available to Buyer with commercially reasonable efforts by Buyer or Seller; (d) defects arising out of lack of corporate or other entity authorization unless it is reasonably likely that the action was not authorized; (e) defects that have been cured by applicable Laws of limitations or prescription; (f) defects based on failure to record Leases issued by any Governmental Authority or the Bureau of Indian Affairs, or any assignments of record title or operating rights in such Leases, in the real property, conveyance or other records of the county or parish in which such Property is located so long as such Leases and/or assignments are filed in the records of the applicable Governmental Authority or the Bureau of Indian Affairs (as applicable); or (g) the issue of the ownership of coalbed methane between the owners of coal

12

rights and the owners of oil and gas rights so long as Seller has Leases from the owners of both of such rights if such ownership is in dispute.

"**Transfer Taxes**" shall have the meaning given that term in Section 12.01(c).

"**Unit Interests**" shall have the meaning given that term in Section 2.02(a).

"**Wells**" shall have the meaning given that term in Section 2.02(b).

Section 1.02   Interpretation.  As used in this Agreement, unless the context otherwise requires, the term "includes" and its syntactical variants means "includes but is not limited to." The headings and captions contained in this Agreement have been inserted for convenience only and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions hereof.  Preparation of this Agreement has been a joint effort of the Parties and the resulting document shall not be construed more severely against one of the Parties than against the other.  All references herein to "Sections" and "Articles" in this Agreement shall refer to the corresponding section and article of this Agreement unless specific reference is made to such sections of another document or instrument.  The words "hereof," "herein" and "hereunder" and words of similar import when used in any agreement or instrument shall refer to such agreement or instrument as a whole and not to any particular provision of such agreement or instrument.

## ARTICLE II
## ASSETS

Section 2.01   Agreement to Sell and Purchase.  Subject to the terms and conditions of this Agreement, Buyer agrees to purchase from Seller and Seller agrees to sell, transfer and assign to Buyer the Assets on the Closing Date.

Section 2.02   Assets.  Subject to Section 2.03, the term "**Assets**" shall mean the Arkoma Membership Interest and, less and except the Excluded Assets, all of CDX Gas, LLC's interests in the properties described in subsections (a) through (o) below and all of each other Seller's properties and assets, including all of such Seller's right, title and interest in and to:

(a)      (i) the oil and gas leases and coalbed methane leases more particularly described in Exhibit A – Part 1 (Seller's interests in such leases, including all overriding royalty interests, collectively, the "**Leases**"), and (ii) the interests in any units or pooled or communitized lands arising on account of the Leases having been unitized or pooled into such units or with such lands (Seller's interests in such units, the "**Unit Interests**");

(b)      all oil and gas and coalbed methane wells attributable to the Leases or Unit Interests (Seller's interests in such wells, collectively and including the wells designated as "PDP" set forth on Exhibit A—Part 2, the "**Wells**" and the Leases, the Unit Interests, and the Wells being collectively referred to hereinafter as the "**Properties**");

(c)      all production facilities, structures, tubular goods, well equipment, lease equipment, production equipment, pipelines, machinery, inventory and all other personal property, fixtures and facilities to the extent appurtenant to or used in connection with the Properties (collectively, the "**Facilities**");

13

3928870v.16

(d)    all permits, licenses, servitudes, easements, rights-of-way, surface fee interests and other surface use agreements to the extent used in connection with the ownership or operation of the Properties or the Facilities, including those described in Exhibit A-Part 3;

(e)    all offices described on Exhibit A – Part 4, including the computers, furniture and other personal property located therein, and the lands and leases associated therewith, including those described in Exhibit A – Part 4;

(f)    the Hydrocarbons produced from or attributable to the Properties from and after the Closing Date and all Hydrocarbons produced therefrom prior to the Closing Date that are in storage prior to sale and that are upstream of the sales metering point as of the Closing Date;

(g)    all contracts and agreements listed in Exhibit A – Part 5 (collectively, the "**Contracts**");

(h)    all Imbalances relating to the Properties;

(i)    all of those records, files, contracts, orders, agreements, permits, licenses, easements, maps, data, schedules, reports and logs relating to the Assets (collectively referred to as the "**Files**");

(j)    a non-exclusive license to use Seller's or its Affiliates' intellectual property rights described in Exhibit A – Part 7, including the seismic and other geotechnical data relating to the Assets described in such Exhibit, all as set forth in the Non-Exclusive License;

(k)    all inventory and general intangibles of any kind or nature relating to the Assets existing as of the Effective Time or any time thereafter, excluding the right to use the name "CDX", and excluding such inventory consumed in the ordinary course of business;

(l)    all claims, asserted or unasserted, contingent or fixed, known or unknown, against Third Parties: (i) relating to the title of the Assets, whether accruing before, on or after the Effective Time, (ii) under insurance policies maintained by or on behalf of Seller attributable to events or omissions occurring or conditions existing with respect to the ownership or operations of the Assets on or after the Effective Time up to the Closing or, to the extent such claims are not assignable, any proceeds attributable to such claims, or (iii) otherwise relating to the Assets to the extent accruing on or after the Effective Time;

(m)    the vehicles owned by Seller and used in connection with the Assets described in Exhibit A – Part 6;

(n)    any trade credits, accounts receivable, proceeds or revenues attributable to the Assets and accruing on or after the Effective Time; and

(o)    all credits, prepayments, payments, advances, refunds and similar amounts attributable to Non-Income Taxes and Production Taxes related to the Assets and attributable to periods on or after the Effective Time.

14

3928870v.16

For the purposes of Section 3.04, Article IV, Article V, Article VIII, Article XI and Article XII the term "Assets" as used therein and in corresponding defined terms shall include the assets of Arkoma.

     Section 2.03   Excluded Assets.   The Assets shall not include, and there is excepted, reserved and excluded from the purchase and sale contemplated hereby, the Excluded Assets. The **"Excluded Assets"** shall mean:

     (a)    all corporate, financial, Tax and legal records of Seller that relate to Seller's business generally (including the ownership and operation of the Assets, but excluding any title opinions, lease and land files, surveys, abstracts, and any other title materials relating to the Assets) or that relate to the other Excluded Assets;

     (b)    any trade credits, accounts receivable, proceeds or revenues attributable to the Assets and attributable to periods prior to the Effective Time;

     (c)    subject to any adjustments to be made pursuant to Section 7.02(b)(i), all Hydrocarbons produced from or attributable to the Properties with respect to any periods of time prior to the Closing Date that are not in storage prior to sale and that are upstream of the sales metering point as of the Closing Date, and all proceeds attributable thereto;

     (d)    all credits, prepayments, payments, advances, refunds and similar amounts attributable to Non-Income Taxes and Production Taxes related to the Assets paid by or on behalf of Seller including pursuant to Article XII or by a downward adjustment of the Purchase Price pursuant to Section 7.02 and attributable to Tax periods (or portions thereof) prior to the Effective Time;

     (e)    all proceeds from the settlements of contract disputes with purchasers of Hydrocarbons from or attributable to the Properties, including settlement of take-or-pay disputes, insofar as said proceeds accrued prior to the Effective Time;

     (f)    all area-wide permits and licenses or other permits, licenses or authorizations used in the conduct of Seller's business generally;

     (g)    all guaranties, letters of credit, comfort letters, surety bonds, support agreements and other credit support provided by Seller or Seller's Affiliates in support of the obligations of Seller with respect to the Assets;

     (h)    all rights, titles, claims and interests of Seller or its Affiliates under any insurance policy or agreement, to any insurance proceeds or to or under any bond or bond proceeds other than proceeds of claims attributable to events or omissions occurring or conditions existing with respect to the ownership or operations of the Assets on or after the Effective Time but prior to the Closing;

     (i)    except as expressly described in Section 2.02(l), all rights and claims relating to the Assets to the extent accruing prior to the Effective Time;

15

(j)     subject to the Non-Exclusive License, all Intellectual Property, including all patents, patent applications, logos, service marks, copyrights, trade names or trademarks of or associated with Seller, its Affiliates or their businesses;

(k)     all privileged attorney-client (i) communications and (ii) other documents (other than title opinions);

(l)     all materials and information that cannot be disclosed to Buyer as a result of confidentiality obligations to Third Parties;

(m)     all audit rights arising under any of the Contracts and attributable to any periods of time prior to the Effective Time or to any of the Excluded Assets, except for any Imbalances;

(n)     all amounts paid by any Person to Seller or its Affiliates as overhead for periods of time accruing prior to Closing under any joint operating agreements burdening the Assets;

(o)     all master service agreements and those contracts listed in Exhibit B;

(p)     all oil and gas leases and related properties and assets located in the Uintah County, Utah, Grand County, Utah, or Garfield County, Colorado or otherwise relating to the Moon Ridge prospect, the North Displacement Point prospect, the Displacement Point prospect, the South Baxter Pass prospect, or the Snow Grove Mesa prospect; and

(q)     other than any confidentiality agreements relating to the Assets, all materials, information and analyses developed or prepared in connection with marketing Seller, its Affiliates and/or the Assets, including presentations, valuations, bids and bidder lists and all communications with marketing advisors.

## ARTICLE III
## CONSIDERATION

Section 3.01   Purchase Price.  The consideration for the purchase, sale and assignment of the Assets by Seller to Buyer is Buyer's payment to Seller of the sum of $29,321,380 (the "**Purchase Price**"), as adjusted pursuant to this Agreement (the "**Adjusted Purchase Price**"). The Adjusted Purchase Price, less the Deposit (and all interest earned thereon), shall be paid by Buyer to Seller at the Closing by means of a completed wire transfer in immediately available funds to the account of Seller as designated by Seller to Buyer in writing prior to the Closing unless otherwise instructed by the Sale Order.

Section 3.02   Deposit.

(a)     Contemporaneously with the execution of this Agreement, Buyer shall deposit by wire transfer in same day funds with the Escrow Agent the sum of $1,466,069 (the "**Deposit**"). The Deposit shall be held by the Escrow Agent in an interest-bearing escrow account pursuant to the Deposit Escrow Agreement.  If Closing occurs, the Deposit (and all interest earned thereon) shall be applied toward the Purchase Price at the Closing.

16

3928870v.16